USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 96-2288 McGAW OF PUERTO RICO, INC., Petitioner, v. NATIONAL LABOR RELATIONS BOARD, Respondent. ____________________ ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD ____________________ Before Selya, Circuit Judge, _____________ Aldrich and Coffin, Senior Circuit Judges. _____________________ ____________________ Francisco Chevere with whom Ariadna Alvarez and McConnell Valdes _________________ ________________ _________________ were on brief for petitioner. Fred L. Cornnell, Supervisory Attorney, with whom David A. Seid, _________________ _____________ Attorney, Frederick L. Feinstein, General Counsel, Linda Sher, ________________________ ___________ Associate General Counsel, Aileen A. Armstrong, Deputy Associate _____________________ General Counsel, and National Labor Relations Board were on brief for _______________________________ respondent. ____________________  December 10, 1997 ____________________ ALDRICH, Senior Circuit Judge. The National Labor ____________________ Relations Board ("the Board") asks us to enforce its decision and order of October 31, 1996, finding that McGaw of Puerto Rico, Inc. ("McGaw" or "the Company") engaged in various unfair labor practices in violation of Sections 8(a)(1) and (3) of the National Labor Relations Act ("the Act"). McGaw responds that substantial evidence does not support the Board's findings that it unlawfully discriminated against employees because of their engagement in union activities and/or to discourage others from such engagement. We disagree, and grant the request for enforcement. I. Factual Background The record supports the Board's findings1 of the following facts, arranged chronologically. McGaw has manufactured medical devices and related products at a plant in Sabana Grande, Puerto Rico, since 1974. With about 1100 employees working three shifts at the plant, McGaw is one of the largest employers in the region. The Congreso de Uniones Industriales de Puerto Rico ("the Union") has been trying to organize McGaw's Sabana Grande workers since 1992. Several  ____________________ 1. The Board completely adopted the findings of fact, conclusions of law, and recommended order of the administrative law judge ("the ALJ") who heard the case in June 1995. The Board need not make independent findings or conduct a separate analysis of the factors prompting the order if it specifically adopts the findings and reasoning of the ALJ. See, e.g., NLRB v. Horizon Air Servs., Inc., 761 ___ ____ ____ _________________________ F.2d 22, 24 n.1 (1st Cir. 1985). -2- McGaw employees, including alleged discriminatees Charlie Silva, Vigdalia Rodriguez, and Lourdes Irizarry -- all Line Production Clerks ("LPCs") at the Company -- were active leaders in the Union's efforts. Individually or as a group, they distributed union authorization cards at the plant, spoke to employees about the Union, acted as election observers, delivered speeches over loudspeakers in front of the plant, promoted the Union on a local radio program, wore prounion stickers, and held union meetings at their homes. The Company reorganized its engineering department in 1992, eliminating, first, several mechanic positions and later, four LPC positions. The affected employees were not laid off, but, instead, reassigned to other positions. The Company advised them by memo that "the elimination of these positions was carried out taking into consideration several factors such as general skills and abilities, seniority, attitude and others concerning general performance." The Union, by a narrow margin, won an election held in February 1993. After 48 ballots were challenged, the parties stipulated to a second election, to be conducted on November 9 by the Board. In the meantime, McGaw was undergoing significant operational reorganization. Ira Marshall ("Marshall"), appointed General Manager at Sabana Grande in July 1993, found the existing operations a "disorganized mess" and set about a multi-million dollar -3- overhaul of the plant's production system. Central to the reorganization of the Company's operations was the phased replacement of its "workcell" production method with a conveyor belt system. Under the workcell system, each employee completely assembled a given product. LPCs liaised between supervisors and production employees, keeping track of production by performing largely clerical tasks. Under the new conveyor system, each employee performed a discrete partial assembly step. LPCs often worked the conveyor belt alongside production employees during the transition, although installation of the belts rendered obsolete much of their clerical responsibilities. In October 1993, the Company laid off some 140 employees as part of its restructuring. Preceding the layoff, Human Resources Manager Alex Solla informed the employees by memo that "[s]eniority (employment date) by classification and general performance are the criteria used in order to determine affected employees," and that "hourly employees affected and having more seniority in the organization will be offered the opportunity of bumping/replace [sic] other employees with less seniority in Assembler I positions." In the same month, the Company closed its sterilization department and transferred about ten affected employees to production. -4- In the following month, McGaw installed its first conveyor belt. Also, the Board conducted its second election, in which the Union failed to get a majority vote. Weeks before the election, a Company supervisor had asked LPC Maria Belen whether she had been "promoting the Union amongst the employees." Company officials also asked her why she had not identified herself as a non-union employee by wearing a "NO" sticker, to which she replied that she considered herself a key person among employees and that wearing such a sticker might create friction within the Company. Restructuring continued in February 1994, the Company laying off close to twenty employees. Also in February, the Company changed its LPC shift assignment policy from classification seniority to plantwide seniority. The Company notified affected employees of its "new change of policy" by letter: "[p]ursuant to the seniority policy of our company, we have restructured the assignment of work shifts of the line production clerk position, in accordance to the date when the incumbents in such position began working at [the Company] (plant seniority)." LPCs Nilsa Nazario and Vigdalia Rodriguez, forced to take less desirable shifts, complained to management about the change and lack of prior notice. At a February 28 meeting with a supervisor, Rodriguez asked about the change, and received the vague explanation that "Company policy had changed a while back." -5- Sometime in February or March, a supervisor asked LPC Raquel Gonzalez, a member of the "Vote No" group, to report to management any future union activity of LPC Lourdes Irizarry known to Gonzalez. Gonzalez promised to comply, but never in fact reported anything about Irizarry. In a conversation on or about March 10, Human Resources Manager Solla told LPC Silva that he and other employees "were mistaken with the union idea because if Sabana Grande had been a large town, the Union would have won. But since Sabana Grande was a small town, it was a town with people with small minds. And that it would be easy for the Company to scare people and get them to vote against the Union." Sometime in April, Production Superintendent Geraldo Gonzalez asked LPC Belen "what kind of comments [she] had overheard about the Union." He later told her that if the Union "came back," McGaw's owners would not fight the Union, but rather would close the plant without warning and without paying workers for their final week of work. Gonzalez further added that "the people that were laid off for that reason would not be able to get work from other companies because they would know that the reason for the layoff was because of unions." It became clear to Company management sometime during the first half of 1994 that personnel changes would -6- accompany the production transition. In a May 18 memo to Solla, Marshall indicated his views as to the need for "less unskilled people" under the conveyor system, the need to establish a "new more technical and flat organization," and the need to replace "many people that cannot adapt to the technology." He instructed Solla to meet with Operations Manager Juan Luis Santa to "develop a tentative plan to organize and upgrade our human technical expertise . . . [and that] this should be done by 610/94 [sic]." Around the same time, the Union campaigned for a third election. Union president Jose Figueroa, along with LPCs Silva and Irizarry and mechanic Juan Vargas, arranged for a May 29 meeting of prounion employees, held at a local beach. A McGaw supervisor stood within visual range of the meeting, and an employee who was in the "Vote No" group also was seen nearby. Management memos and documents dated shortly after the May 29 Union meeting confirm the Company's determination to eliminate LPC positions. In a June 8 memo to his supervisor, Gary Sielski, Marshall indicated the anticipated elimination of 10 LPC positions, stating that "[t]he objective will be to discharge people by performance, educational training, and seniority. We are doing this . . . [because] [w]e need people with the discipline to manage the [conveyor] system. They must also have the education to -7- learn to use the system and perform additional reporting and record keeping." In a memo to Marshall the following day, Operations Manager Santa stated that he had requested Human Resources Manager Solla to "reduce ten (10) production line clerks, based on performance, academic background, and seniority," with the direction that the reduction occur no later than the end of June. On June 13, Marshall submitted a "Monthly Activity Report" to Sielski, setting forth the Company's activities, plans, and priorities, and identifying the elimination of the "union threat" as one of the Company's priorities. The Report also stated the Company's plans to "hire 39 people, 29 for increased production and 10 for backlogged rework." On or about June 22, Company officials, including Marshall, Solla, and Employee Relations Manager Miriam Figueroa, met with employees. According to LPC Rodriguez, Marshall stated that "he did not want third parties involved in the plant with them because [the employees] could talk with them, or dialogue with them." She further testified that Marshall stated that "neither the employees nor the supervisors needed to talk about the Union, that the only people that could talk about Unions were himself and Alex Solla." LPC Silva testified that Marshall stated that the Company had a lot of money to invest in employee salaries and benefits, and that he "didn't want third parties to come in -8- order to obtain those benefits for the employees." Silva recalled that Marshall said he "did not want to hear employees talking in the hallways, whether it be pro or con, for or against the Union, and that if there needed to be any Union talk in McGaw it would be done between himself and Alex Solla in his office." Silva also testified that Marshall told the employees that "things were looking good" at the company, that sales were up, and that "at the moment there were no plans to fire or dismiss anybody." Marshall claimed that, because emotions about the Union were running high, he stressed to the employees at the meeting that "no one was to be threatening anyone . . . for supporting or not supporting the Union." He claimed that it was Solla rather than he who told the employees that only he and Solla were authorized to discuss the Union, and that the statement referred to those management officials who were authorized to speak on behalf of the Company regarding the Union. Figueroa testified that Marshall informed the employees that he would not allow any threats among employees, and that anyone who felt threatened should speak with Solla or him. Figueroa's testimony was consistent with Marshall's insofar as it was Solla who had said that the only management representatives allowed to "make any updates on the Union" were Marshall and Solla. -9- Barely more than a week later, on June 30, the Company laid off nine LPCs. The nine were laid off without warning, and strictly according to plantwide seniority rather than the manifold criteria listed in the Marshall and Santa memos. Marshall testified that Santa, rather than he, was responsible for the change, and claimed that Santa and Solla had met with the Company's legal counsel, who advised them to "just stick with Law 80"2 and go by "length of service." Company officials conducted layoff interviews with the affected employees, who were told that the layoffs were due to restructuring. Several asked about being transferred to other positions, as had been the Company's past practice. They were told, variously, that "Company policy had changed, and that they would no longer be doing it that way," "Company policy is that if a job classification is eliminated, there is no chance of relocation," "Company policy was no longer to relocate people in lower positions, and that the policy had changed," and "we don't have any openings at that time, and if we do that, we would be violating Law 80." Following the June layoff, the Company hired about 50 "temporary" production employees, and would have refused to rehire any of the laid-off employees as temporary employees had they asked.  ____________________ 2. "Law 80" is Puerto Rico Public Law 80, 29 L.P.R.A. 185a-m. Law 80 addresses an employer's obligations in reducing its workforce. The Company's claims with respect to Law 80 are addressed below. -10- The Company installed two additional conveyor belts in July 1994, and two more in April 1995. II. Procedural Background Pursuant to charges filed by the Union, the Board issued a complaint and notice of hearing on March 24, 1995. The complaint alleged that McGaw violated Section 8(a)(1)3 of the National Labor Relations Act ("the Act"), 29 U.S.C. 158(a)(1), by soliciting employees to spy on and report other employees' union activities, expressing to employees the futility of engaging in union activities by telling them it was easy to instill fear in them so that they would vote against the Union, interrogating an employee concerning the Union's activities at the Company's plant, threatening employees with plant closure and loss of wages if they supported the Union, threatening to "blackball" employees regarding future employment opportunities if they supported the Union, and prohibiting employees from talking about the Union at the plant. The complaint further alleged that McGaw violated Section 8(a)(3)4 of the Act, 29 U.S.C. 158(a)(3),  ____________________ 3. Section 8(a)(1) provides that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of" their statutory rights to self-organize, form, join, and assist labor organizations, and engage in collective bargaining. 4. Section 8(a)(3) provides, in relevant part, that "[i]t shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." -11- by changing its seniority policy from classification to plantwide seniority and by laying off nine LPCs on June 30 because they joined and assisted the Union, and/or to discourage employees from engaging in Union activities. Named as discriminatees in the complaint were LPCs Jose Luis Pacheco, Francisco Jusino, Raquel Gonzalez, Scipio Vega, Lourdes Irizarry, Maria Belen, Charlie Silva, Vigdalia Rodriguez, and Nilsa Nazario.5 The Company denied the allegations. After a full hearing, the administrative law judge ("the ALJ") sustained each of the Union's allegations, finding as a matter of law that McGaw had violated Sections 8(a)(1) and (3) of the Act. Following these findings was a detailed remedy and recommended order. McGaw timely excepted, and a three member panel of the Board affirmed the ALJ's rulings, findings, and conclusions, and adopted his order with slight modification. The Board ordered McGaw to cease and desist, and to reinstate and make whole those unlawfully laid off. We have jurisdiction over McGaw's appeal pursuant to Sections 10(e) and (f) of the Act, 29 U.S.C. 160(e) and (f). III. Discussion A. Standard of Review  ____________________ 5. At the hearing, the Company and Irizarry entered into a private settlement agreement, approved by the ALJ, whereby Irizarry waived her right to reinstatement. Various other complaint allegations were settled or otherwise disposed of at the hearing. -12- "We will enforce a Board order if the Board correctly applied the law and if substantial evidence on the record supports the Board's factual findings." Union _____ Builders, Inc. v. NLRB, 68 F.3d 520, 522 (1st Cir. 1995); see ______________ ____ ___ also, e.g., Sullivan Bros. Printers, Inc. v. NLRB, 99 F.3d ____ ____ _____________________________ ____ 1217, 1221 (1st Cir. 1996). As long as the Board's interpretation of applicable statutes is "reasonably defensible," Kelley v. NLRB, 79 F.3d 1238, 1244 (1st Cir. ______ ____ 1996), we will uphold the Board's conclusions of law "even if we would have reached a different conclusion." Union _____ Builders, 68 F.3d at 522; see also Providence Hosp. v. NLRB, ________ ___ ____ ________________ ____ 93 F.3d 1012, 1016 (1st Cir. 1996) ("[A]ppellate courts ordinarily should defer to the Board's interpretations of the statutes it must enforce, such as the NLRA, whenever such interpretations flow rationally from the statutory text."); Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir.) _____________________ ____ ("The court may not substitute its judgment for that of the Board when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo ________ . . . ." (internal quotations omitted)), cert. denied, 464 ____________ U.S. 892 (1983). The Board's findings of fact are "conclusive" if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. 160(e). "'Substantial evidence is -13- more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Penntech Papers, 706 F.2d at 22 (quoting ________________ Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). _______________________ ____ In determining whether such substantial evidence exists, we "must take into account whatever in the record fairly detracts from the Board's fact finding as well as evidence that supports it." Id. (internal quotations omitted). We ___ will "sustain inferences that the Board draws from the facts and its application of statutory standards to those facts and inferences as long as they are reasonable." NLRB v. ____ Laverdiere's Enters., 933 F.2d 1045, 1050 (1st Cir. 1991). _____________________ Finally, "[t]he ALJ's credibility determinations are entitled to great weight since he saw and heard the witnesses testify." Holyoke Visiting Nurses Ass'n v. NLRB, 11 F.3d ______________________________ ____ 302, 308 (1st Cir. 1993); see also NLRB v. Horizon Air ___ ____ ____ ____________ Servs., Inc., 761 F.2d 22, 25 (1st Cir. 1985). ____________ B. Section 8(a)(1) Violations Whether by oversight or admission, McGaw has not here contested the Board's findings that it violated Section 8(a)(1) by soliciting employees to spy and report, making union activity appear futile, interrogating employees, threatening plant closure and loss of wages, threatening to "blackball" union supporters, and prohibiting employees from talking about the union. By failing to contest these -14- findings, McGaw has waived its right to object to them as erroneous. See Horizon Air Servs., 761 F.2d at 26. Further, ___ __________________ the unlawful practices underlying these uncontested findings "do not disappear by not being mentioned in [McGaw's] brief," but rather remain to inform our consideration of the Board's other findings. NLRB v. Clark Manor Nursing Home Corp., 671 ____ ______________________________ F.2d 657, 660 (1st Cir. 1982). -15- C. Section 8(a)(3) Violations It is an unfair labor practice "for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. 158(a)(3). Whether an employer's action adverse to employees is a 8(a)(3) violation turns on the employer's primary motivation. See generally NLRB v. Transportation ___ _________ ____ ______________ Management Corp., 462 U.S. 393, 397-403 (1983). If the goal ________________ is to discourage union activity, there is a violation. If there is no anti-union motive, or if the same action would have been taken based on some other, non-discriminatory, motive, there is no violation. Motive may be inferred from both direct and circumstantial evidence. See NLRB v. Pilgrim ___ ____ _______ Foods, Inc., 591 F.2d 110, 118 (1st Cir. 1978). ___________ The General Counsel makes a prima facie showing of unlawful discrimination by establishing: (i) protected activity by employees; (ii) the employer's knowledge of this activity; (iii) the employer's animus toward unions; and (iv) a causal connection between the animus and the action taken against employees. See Carry Cos. of Illinois, Inc. v. NLRB, ___ ____________________________ ____ 30 F.3d 922, 927 (7th Cir. 1994); see also Pilgrim Foods, 591 ___ ____ _____________ F.2d at 118. In other words, the General Counsel must prove at the outset that "the employee's protected conduct was a substantial or motivating factor for the discharge" or other -16- adverse action. Horizon Air Servs., 761 F.2d at 27. The ___________________ burden then shifts to the employer to prove, by a preponderance of the evidence, that it had another motive that was both legitimate (non-pretextual and based on other than protected conduct) and primary (would have produced the same outcome regardless of the protected activity). See ___ Transportation Management, 462 U.S. at 400-05; see also, __________________________ ___ ____ e.g., Horizon Air Servs., 761 F.2d at 27. ____ __________________ Doggedly, McGaw attacks each element of the prima facie case. It first contends that not all of those laid off engaged in protected activities, and that laying off the nine LPCs did not eliminate all of the Union's active supporters, some of whom were not LPCs. McGaw demands more than is required. Some of those laid off -- Irizarry, Silva, and Rodriguez -- clearly were among the Union's most ardent supporters, and the Company need not lay off all union supporters at once to violate 8(a)(3). See NLRB v. ___ ____ Instrument Corp. of Am., 714 F.2d 324, 330 (4th Cir. 1983). ________________________ Ordering layoffs "for the purpose of discouraging union activity or in retaliation against . . . employees because of the union activities of some" violates 8(a)(3), even if some of those laid off were neutral or even against the union. Birch Run Welding & Fabricating, Inc. v. NLRB, 761 ______________________________________ ____ F.2d 1175, 1180 (6th Cir. 1985); see also Merchants Truck ___ ____ ________________ Line, Inc. v. NLRB, 577 F.2d 1011, 1016 (5th Cir. 1978). __________ ____ -17- McGaw then claims it did not know of the union activities of those laid off, and in any case, harbored no anti-union sentiment. This strains credibility. LPCs Rodriguez, Irizarry, and Silva each were overt and active Union supporters, both within and without the plant. Before the ALJ, Company officials admitted to knowing as much and to observing union activity at the plant. Further, McGaw failed to explain credited allegations that Company officials solicited an employee to spy and report on Irizarry's union activities and, barely a month before the June layoffs, observed the Union meeting at the beach where Silva and Irizarry were present. Also, McGaw's denial of anti-union animus falls flat in light of Marshall's comments about dissolving the "union threat" and keeping "third parties" out of the plant, the Company's attempts to spy on Irizarry and to intimidate union supporters through interrogation and various threats, the Company's interrogation of LPC Belen as to her Union sentiments, as well as the Company's prohibition of discussion of the Union among employees. Substantial evidence supports the Board's findings of both knowledge and anti-union animus. Closing its assault on the General Counsel's prima facie case, McGaw argues that, because both Union and Company supporters were laid off, a sufficient causal connection between any anti-union animus and its actions is absent. As -18- noted, adverse action may be unlawfully discriminatory whether or not all union adherents suffer at once. See Birch ___ _____ Run Welding & Fabricating, 716 F.2d at 1180; Merchants Truck _________________________ ________________ Line, 577 F.2d at 1016. In any case, McGaw misses the mark; ____ it is the departure from past Company practices, in combination with the LPC layoffs, that the Board found to be a violation. It is undisputed that, had McGaw used classification seniority to effectuate the June layoffs, LPCs Irizarry, Rodriguez, and Belen would not have been laid off. Also, McGaw inexplicably departed from its past practice of relocating, rather than laying off, workers when a position was phased out. This occurred at a time when its managers expressed the need for "less unskilled people" under the conveyor system and more people with the "education to learn to use the system and perform additional reporting and record keeping," and at a time when it planned to hire about 40 people for production and rework (and in fact hired about 50 "temporary" production employees following the layoff). These facts, together with McGaw's knowledge of Irizarry's and Rodriguez's union activities, its suspicion of Belen's union sentiments, and its anti-union animosity, support the Board's inference that McGaw changed its LPC seniority policy in February 1994 if not to discriminate immediately against union supporters then to lay the groundwork for the eventual termination of key union leaders in the LPC position. We -19- reject McGaw's position that no causal connection existed, and instead accept the Board's conclusion that such adverse action, calculated to affect key Union leaders, unlawfully discriminated against Union activists and/or was taken to discourage others from supporting the Union. Prepared for rejection of its first round of argument, McGaw responds that legitimate business reasons would have led it to lay off the nine LPCs, regardless of any union animosity. The Board accepted that the Company's production transition inevitably would render obsolete many of the LPCs' traditional functions, and we do not disagree. But again, McGaw misses the point. The issue is not whether McGaw had a primary nondiscriminatory reason for the layoffs generally, but rather whether it had such a reason to depart from its past practices, departures which appear to have been calculated to adversely impact employees engaged in protected activities. See Birch Run Welding & Fabricating, 761 F.2d at ___ _______________________________ 1181 (noting that "an employer's deviation from past practice" is persuasive evidence of an unlawful motive); cf. ___ Transportation Management Corp., 462 U.S. at 404 ___________________________________ (highlighting employer's departure from its usual practice); Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 814 (3d Cir. _____________________ ____ 1986) (same), cert. denied, 481 U.S. 1069 (1987); Merchants _____________ _________ Truck Line, 577 F.2d at 1016 (same). To this, McGaw ___________ persistently but rather lamely maintains that it never -20- changed policies at all. We must reject this; not only do the Company's past practices and statements, recounted above, indicate the opposite, but the ALJ found McGaw's sole witness on this issue -- Miriam Figueroa -- not to be credible. The Board did not disturb this credibility finding; nor do we. Thus, McGaw's explanation for the layoffs, although plausibly non-discriminatory, does not explain why the Company changed its seniority and relocation policies. Finally, McGaw points to Puerto Rico Public Law 80, 29 L.P.R.A. 185a-m ("Law 80"), as requiring it to make layoffs according to plantwide seniority. Despite the weight of the evidence, McGaw maintains that it has always used plantwide seniority, in accordance with Law 80, in effectuating layoffs. Its unstated argument, apparently, is that even if this is found not true, its switch to plantwide seniority from classification seniority was nondiscriminatory because Law 80 required the change. The Board did not agree; nor do we. Law 80 entitles employees who are discharged "without good cause" to severance compensation, calculated in part by years of service. See 185a. "Good cause," in ___ turn, includes the full, temporary, or partial closing of the employer's operations, 185b(d), technological or reorganization changes, 185b(e), and reductions in employment made necessary by a reduction in the anticipated -21- or prevailing volume of production, sales, or profits at the time of the discharge, 185b(f). In any of these three circumstances, the employer has a duty . . . to retain those employees of greater seniority on the job with preference, provided there are positions vacant or filled by employees of less seniority in the job within their occupational classification which may be held by them . . . except . . . in those cases in which there is a clear and conclusive difference in favor of the efficiency or capacity of the workers compared, in which case the capacity shall prevail . . . . 185c. McGaw clings to this provision as a statutory command to use plantwide, rather than classification, seniority. The meaning of 185c is less than clear. The word "job" could refer to employment generally (i.e., "plantwide"), or to employment in a specific position. The Guidelines for the Interpretation and Application of Law 80, May 30, 1976 ("Guidelines"), promulgated by the Puerto Rico Department of Labor and Human Resources, indicate the former, although they are nevertheless ambiguous as to the meaning of 185c. On the one hand, the Guidelines say: If there is a need to dismiss employees within any or some occupational classifications, the employer will be obligated to retain with preference in said classifications the employees with the greatest seniority in the company, _______________ and to that effect all the time worked continuously and uninterruptedly for the company will be considered, regardless of -22- the occupational classifications where they were performed. Guidelines, 9 (emphasis added). On the other hand, the Guidelines say: "When the employer needs to lay off workers . . . he does not necessarily have to do so following an order of seniority since the law does not require this." Id. ___ at 10.6 Whatever the meaning of 185c, its role within the scheme of Law 80 and Law 80's relation to federal labor law suggest that Law 80 does not have the effect that McGaw seeks to give it. First, as we have previously noted, Law 80 does not require an employer to use plantwide seniority, but merely provides employees with an action for severance pay if discharged "without good cause." See Rodriguez v. Eastern ___ _________ _______ Air Lines, Inc., 816 F.2d 24, 28 (1st Cir. 1987). Thus, ________________ whether Law 80's seniority provision, whatever its meaning, has been complied with is relevant only to the existence of  ____________________ 6. We also note, in passing, the Guidelines' advisory that: if the skills required to operate machinery, to work new designs or to adapt to new procedures can be easily acquired through a simple and inexpensive training the employer is under the obligation to provide said training and cannot fire the employees who need it under penalty of being responsible under Law No. 80. Id. at 18. Insufficient facts have been adduced to determine ___ whether this provision applies in this case, although it does suggest that McGaw may have had some duty to re-train the affected LPCs. -23- "good cause." Law 80 does not, as McGaw argues, require it to use plantwide seniority, but at most merely says that if it does not, it may have to provide severance pay. Cf. ___ Rivera v. Security Nat'l Life Ins. Co., 106 D.P.R. 517, 527 ______ _____________________________ (1977). "[B]ut an employer willing to pay the price is free to discharge whomever he or she pleases." Rodriguez, 816 _________ F.2d at 28. In short, "[a]lthough Law 80 obviously is designed to assist those injured by arbitrary discharge practices, there is every indication from its language and other sources that the legislature intended to avoid direct interference with the employer's business operation," id., ___ including its seniority and relocation policies. McGaw's practices and statements indicate that, before the June 1994 layoff, it used criteria other than plantwide seniority and allowed senior affected employees to relocate. It would be perverse indeed to allow it now to invoke a statute enacted for the protection of workers as a justification for its unlawful labor practices. Second, the Guidelines indicate that "if [a] dismissal of an employee turns out to be an illegal work practice, the applicable law is the Puerto Rico Labor Relations Act or the National Labor Relations Act, as the case may be." Guidelines, 11. Because McGaw's actions were unlawful under the latter, that is the controlling authority. Finally, McGaw does not direct us to any case law interpreting Law 80 in a manner helpful to its argument. -24- IV. Conclusion We conclude that, because substantial evidence supports the Board's findings, its order should be enforced. The Board's findings of various 8(a)(1) violations are summarily affirmed, given McGaw's failure to challenge them. Further, we accept the Board's conclusion that substantial evidence indicates that the challenged layoffs were motivated primarily by anti-union animus and that McGaw's justifications for the particular layoffs at issue are insufficient. Although McGaw may have had a legitimate reason for the LPC layoffs generally, it had no such reason for its changes in policy, which, together with the layoffs, adversely affected leading union activists and/or were taken to discourage others from supporting the Union. Viewed in light of McGaw's anti-union animus, we have no trouble accepting that the layoffs constituted unlawfully discriminatory labor practices under the Act. Given McGaw's contention that the LPC position no longer exists at its plant, we leave the issue of reinstatement to compliance proceedings.7 Cf. Holyoke Visiting Nurses Ass'n, 11 F.3d at ___ ______________________________ 308; NLRB v. Globe Mfg. Co., 580 F.2d 18, 21-22 (1st Cir. ____ _______________ 1978).  ____________________ 7. The Board ordered McGaw to "offer [the discriminatees] full . . . reinstatement to their former jobs or, if those jobs no longer exists [sic], to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed." -25- The order of the Board shall be enforced. _________________________________________ -26-