# United States Court of Appeals

## For the First Circuit

No. 05-1924

NATIONAL LABOR RELATIONS BOARD,

Petitioner/Cross-Respondent,

v.

HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES
INTERNATIONAL UNION LOCAL 26, AFL-CIO,

Respondent/Cross-Petitioner.

ON APPLICATION FOR ENFORCEMENT AND CROSS-PETITION FOR
REVIEW OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before

Lipez, <u>Circuit Judge</u>,
Campbell and Bowman,<sup>*</sup> <u>Senior Circuit Judges</u>.

<u>David Seid</u> with whom <u>Jill A. Griffin</u>, Supervisory Attorney,
<u>Arthur F. Rosenfeld</u>, Acting General Counsel, <u>John E. Higgins, Jr.</u>,
Deputy General Counsel, <u>John H. Ferguson</u>, Associate General
Counsel, and <u>Aileen A. Armstrong</u>, Deputy Associate General Counsel,
were on brief for petitioner/cross-respondent.
<u>Ellen C. Kearns</u> with whom <u>Jeffery M. Rosin</u> was on brief for
respondent/cross-petitioner.

April 28, 2006

<sup>*</sup>Of the United States Court of Appeals for the Eighth Circuit,
sitting by designation.

**BOWMAN**, **Senior Circuit Judge**.  The National Labor Relations Board ("Board") issued an order affirming the decision of an administrative law judge ("ALJ") that the Hotel Employees and Restaurant Employees International Union, Local 26, AFL-CIO ("Union"), violated the National Labor Relations Act ("NLRA") by discharging Emma Johnson because she engaged in protected concerted activity and by telling another employee that the Union discharged Johnson because of such activity.  The Board's General Counsel applies for enforcement of the Board's order.  The Union petitions for review of the order, asking this Court to set aside the adverse ruling or remand the case for additional findings.  We deny the Union's petition for review and grant the General Counsel's application for enforcement of the Board's order.[1]

## I.

The Union, a local affiliate of the International Union, represents 5800 hotel workers in and around Boston, Massachusetts.  In 1997, the Union hired Janice Loux as its president.  Loux had exclusive authority to hire and discharge Union employees.  Loux created a research department to organize more effectively at Boston area hotels.  Martin Leary, a research supervisor for the International Union, assisted the Union in creating its research

---

[1]We derive the operative facts recited in part I from the ALJ's specific findings and from the record evidence that is consistent with the ALJ's findings and credibility determinations.

department.  In September 1998, Loux hired Johnson as a researcher. Loux later hired Mark Parker as a researcher.

In May 1999, Leary evaluated Johnson.  Leary rated Johnson's overall quality of work as very good and her specific work habits and skills from excellent to satisfactory.  Leary wrote that Johnson's strengths were "[m]anaging work tasks, facilitating communication among team members & keeping us on task, and mastery of the details of the development process."  As for areas needing improvement, Leary wanted Johnson to show "[m]ore initiative in cultivating new sources & generating issues"; "dig[] deeper to understand target companies"; and increase her "exposure to specific info-gathering techniques."  As for Johnson's ability to prioritize work, set work goals, and manage work schedule/time, Leary commented, "Thank God someone on the team can do this!"  When Johnson later met with Loux and Leary about the evaluation, Loux did not disagree with Leary's evaluation.  And neither Loux nor Leary criticized Johnson's work.

In June 1999, the Logan Airport Ramada Inn (owned by Hilton Hotels) announced that it was closing, it would discharge all employees, Hilton Boston would later open and operate the hotel, and Hilton would not provide a right of employment to hotel employees.  In July 1999, Loux decided that the Union would begin a leafletting campaign to advertise its dispute with Hilton.  Loux announced, "We're starting a picket line at the Back Bay Hilton.

Everyone cancel all your plans for the summer. We're going to be doing this 7 days a week, all summer long. We're going to be leafletting. And it's in 2 hour shifts." Loux alerted employees that the campaign could last until October, that she would assign the shifts, and that the employees could not switch their shifts with each other. The leafletting initially ran from 10:00 a.m. to 8:00 p.m., but later began at 8:00 a.m. Each employee was required to leaflet in a two-hour shift that started at various times from day to day, as opposed to leafletting at the same time each day. While leafletting, employees had to follow certain rules, one of which forbade employees from placing leaflets or personal property on Hilton property. In addition to leafletting seven days per week, employees also were required to perform their other job duties.

After a week of leafletting, Johnson requested that Loux allow employees to switch shifts. Loux denied the request. Johnson then approached co-employees about their interests in switching shifts. Johnson also prepared an alternative schedule so employees could enjoy a day off on the weekend. Johnson's proposed schedule required each employee to work one, four-hour shift each weekend rather than two-hour shifts on both Saturday and Sunday. Some employees were interested in these ideas, and Johnson informed them that she was going to raise her ideas at a staff meeting.

-4-

Loux later informed two employees, including Calvin Wu, that Johnson complained about the leafletting schedule. Loux asked whether they preferred two, two-hour shifts or one, four-hour shift on weekends. Wu said he preferred one shift per weekend.

During the campaign, Loux acknowledged at a staff meeting that she knew "people were getting frustrated" and that there were "some grumblings on the picket line." At another staff meeting, Johnson twice asked Loux if employees could switch shifts. Loux denied the requests. Johnson told Loux that "the issue of the weekends is becoming a big issue so how about . . . changing the two hour blocks into the four hour blocks and giving people one weekend day off." Loux responded, "No. There will be no switching the schedule. It stays as it is."

Johnson later gave Loux a revised schedule that allowed employees to have an early shift on one weekend day to avoid having two, mid-day shifts on the weekend. Loux did not allow Johnson to discuss the proposed schedule but said she would look at it. The schedule contained a cover letter stating, "Could we do weekend shifts of 4 hours each, thus letting everyone have one weekend day off? One person would do 4 hours one weekend day and none the other day. Or, if not, could those who want to, switch with each other so that they do a 4 hour shift one weekend day and take the other weekend day off? Then get it approved by you."

In late July 1999, Loux complained to Leary, "I'm really at the end of my rope with Emma Johnson and I'm thinking very seriously about terminating her." Loux complained about Johnson's temper, her failure to "put[] in the time," and her complaining about the picket line schedule.

Loux later increased the number of hours that employees would leaflet to four hours per day. At a staff meeting on August 5, 1999, Johnson asked Loux if they could talk about scheduling. Loux "got really angry"; "slamm[ed] her hand on the table"; and responded, "No. We cannot talk about scheduling. There are going to be no changes. . . . No! I am the boss! I make the rules!"

On Friday, August 6, 1999, Loux announced that the Union had reached an agreement with Hilton and that the leafletting would end. Loux then was out of the office until Monday, August 16, the same day Johnson left for a one-day research conference. When Johnson returned on August 18, she asked Loux for a meeting to request time off. Loux responded, "We need to talk about what happened on the picket line. . . . I am just not comfortable with this. . . . I can't have that attitude that you displayed on the picket line. . . . I'm just not comfortable. You're a really good researcher and we'll just do this as a layoff." Johnson asked, "You're firing me for something I did on the picket line?" Loux responded, "It's just not a good fit any more. But, I'll give you a good recommendation and you'll get two weeks pay." Loux then

ordered Johnson to pack her things and leave under an escort. Before the discharge, neither Loux nor Leary told Johnson about any problems at work that might require discharge.

On the day of Johnson's discharge, Wu asked Johnson why she had been discharged. Johnson replied that she was discharged for complaining about the Hilton campaign. Shortly after the discharge, Brian Lang, the Union's director of organizing, told Wu that Johnson was discharged because of her complaints about the Hilton campaign.

Johnson filed an unfair labor practice charge against the Union for discharging her because she engaged in protected concerted activity. The General Counsel filed a complaint with the Board, charging the Union with violating § 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1) (2000) (prohibiting employers from interfering with employees in the exercise of their NLRA rights), by interfering with the exercise of rights guaranteed by § 7 of the NLRA, 29 U.S.C. § 157 (providing employees the right to engage in "concerted activities for the purpose of . . . mutual aid or protection"). Specifically, the General Counsel alleged that Johnson had "engaged in concerted activity with other employees for the purpose of mutual aid and protection by discussing terms and conditions of employment"; "Johnson concertedly complained to [the Union about] the wages, hours and working conditions of [the Union]'s employees by requesting that [the Union] discuss

scheduling issues"; the Union "implicitly threatened its employees with discharge if they engaged in protected concerted activity"; and the Union discharged Johnson.

The Union contends that it discharged "Johnson for four reasons: (A) failure to follow the rules for leafleting during the Hilton campaign; (B) failure to complete required assignments for the Hilton campaign; (C) poor performance as a researcher; and (D) poor attitude." At a hearing conducted by an ALJ, the Union submitted evidence that Johnson (A) violated leafletting rules by placing leaflets and personal property on Hilton property and by sitting down, (B) failed to organize staff to make strategic calls and report on those calls, (C) failed to file one-page reports on hotel projects during the leafletting campaign, and (D) displayed a deteriorating attitude toward her job and the leafletting activities.

An ALJ concluded that the Union violated § 8(a)(1) of the NLRA by discharging Johnson because of her protected concerted activity (i.e., complaining about the leafletting schedule) and by telling Wu that Johnson had been discharged because of her protected concerted activity. After concluding that the General Counsel proved that the Union discharged Johnson for engaging in protected concerted activity, the ALJ explained that under the standards announced in Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989

-8-

(1982), the Union had the burden "to establish that it would have laid off or discharged [Johnson] for good cause despite . . . her union or protected activities." The ALJ determined that the Union failed to meet its burden of proof. The Union and the General Counsel filed exceptions to the ALJ's decision with the Board. Noting that the ALJ did not evaluate the credibility of witnesses who testified about the reasons for Johnson's discharge and did not address discrepancies in key testimony, the Board remanded the case to the ALJ to make additional findings and credibility determinations regarding the Union's proffered reasons for discharging Johnson.

In a supplemental decision, the ALJ made credibility determinations and additional findings. The ALJ found that "Johnson's testimony was detailed and credible," and to the extent that Johnson's and Loux's testimony conflicted, the ALJ credited Johnson's testimony. Notably, the ALJ did "not believe Loux's testimony as to the reasons that she gave for Johnson's discharge." The ALJ decided that Leary's testimony "shows that the primary reason that Loux decided to discharge Johnson was because Johnson had made an effort to convince other employees to concertedly complain about the picket line schedules insofar as they affected their hours of work." The ALJ also stated that Lang's telling Wu that Johnson was discharged because she complained about the leafletting schedule "goes a long way toward establishing a

forceful . . . case."  The ALJ noted that Lang's statement is "certainly consistent with Leary's testimony regarding what Loux told him before Johnson was fired."  The ALJ also concluded that Loux's complaints "about Johnson's attitude, bad temper, and lack of enthusiasm" are "inextricably related to the fact that Johnson made herself a pest in Loux's eyes by continually complaining about the scheduling of the leafleting schedule.  Johnson may have been an irritant to Loux because she was challenging the schedule; but that irritating activity by Johnson is protected" by § 7 of the NLRA.  Thus, the ALJ reaffirmed his decision.  The Union filed exceptions to the ALJ's decision.  The Board affirmed the ALJ's "rulings, findings, and conclusions," and adopted the ALJ's order.[2]

The General Counsel seeks enforcement of the Board's order.  The Union petitions for review of the order, arguing that the Board misapplied Wright Line to find that the Union discharged Johnson for her protected concerted activity and that the Board erroneously concluded that Johnson even engaged in such activity.

II.

We will enforce the Board's order if the Board "correctly applied the law and if its factual findings are supported by substantial evidence on the record."  Acme Tile & Terrazzo Co. v.

_____

[2]Although the Board unanimously affirmed the ALJ's liability findings, one Board member dissented on the ground that the ALJ's remedy was inadequate, arguing that Johnson was entitled to "tax compensation as part of [the] make-whole remedy."

NLRB, 87 F.3d 558, 560 (1st Cir. 1996); 29 U.S.C. § 160(e) (stating that the Board's factual findings are conclusive if supported by substantial evidence).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  McGaw of Puerto Rico, Inc. v. NLRB, 135 F.3d 1, 7 (1st Cir. 1997) (internal quotation marks and citation omitted).  "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the Board's] finding from being supported by substantial evidence.'"  Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R. v. NLRB, 414 F.3d 158, 160-61 (1st Cir. 2005) (quoting Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981)).  The ALJ saw the witnesses testify, so we afford great weight to his credibility determinations.  Holyoke Visiting Nurses Ass'n v. NLRB, 11 F.3d 302, 308 (1st Cir. 1993).

### A.

The Board concluded that the Union violated § 8(a)(1) of the NLRA because Lang told Wu that Johnson had been discharged for complaining about the leafletting schedule.  Contending that the Union does not contest this finding of a violation, the General Counsel asks for summary enforcement of the Board's order as it relates to this violation.  In its initial brief, the Union does not contest this finding.  The only time the Union addresses this part of the Board's decision is when it spends two pages in its reply brief half-heartedly arguing that it contests this finding,

-11-

or at least contesting the relevance of this finding as it relates to the fighting issue of Loux's motivation for discharging Johnson. We conclude that the General Counsel is entitled to summary enforcement of the Board's order as it relates to Lang's statement to Wu. See, e.g., McGaw, 135 F.3d at 11 (holding that the NLRB is entitled to summary affirmance of the Board's findings of § 8(a)(1) violations because the petitioner failed to challenge them); Ramsdell v. Bowles, 64 F.3d 5, 8 (1st Cir. 1995) (stating that a party waived an argument "by failing to raise it in her opening brief on appeal"), cert. denied, 516 U.S. 1113 (1996).

The Union argues that even if we enforce the Board's finding of a violation involving Lang's statement, "it does not affect [the Union]'s arguments with respect to Johnson." We agree that the Union's arguments on the Johnson discharge issue are not foreclosed. At the same time, Lang's statement remains relevant to the Board's finding of a violation on Johnson's discharge. McGaw, 135 F.3d at 8.

### B.

Before asking whether substantial evidence supports the Board's findings and determination that the Union discharged Johnson because of her protected concerted activity, we ask whether the Board erroneously concluded that Johnson engaged in "concerted activit[y] for the purpose of . . . mutual aid or protection." 29 U.S.C. § 157. The Union argues that Johnson did not engage in

concerted activity, but rather engaged in self-motivated complaining about her schedule.

To qualify as concerted activity, conduct "need not take place in a union setting and it is not necessary that a collective bargaining agreement be in effect. It is sufficient that the [complaining] employee intends or contemplates, as an end result, group activity which will also benefit some other employees." Koch Supplies, Inc. v. NLRB, 646 F.2d 1257, 1259 (8th Cir. 1981). We recognize that even a conversation can constitute concerted activity, "but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees." El Gran Combo de Puerto Rico v. NLRB, 853 F.2d 996, 1004 (1st Cir. 1988) (quoting Mushroom Transp. Co. v. NLRB, 330 F.2d 683, 685 (3d Cir. 1964)).

We conclude that substantial evidence supports the ALJ's finding that Johnson engaged in concerted activity. The record shows that Johnson polled co-employees about their desire to switch shifts and/or work only one day per weekend, she informed co-employees that she would present her ideas to Loux at a staff meeting, and she later presented her ideas that would benefit all employees to Loux. Johnson also gave Loux alternative weekend schedules that either would have granted employees one weekend day off per week or at least ensured that the employees did not work in

-13-

the middle of both weekend days. Some employees supported Johnson's ideas. The ALJ did not err in concluding that Johnson's conduct related to group action that would have benefitted the Union's employees such that it constituted concerted activity.

C.

We now focus on the two main issues in this case. First, we ask whether the Board properly applied the Wright Line standard. Under that standard, the General Counsel bears the burden to prove that Johnson's protected concerted activity was a motivating factor in Loux's decision to discharge Johnson. See NLRB v. Hosp. San Pablo, Inc., 207 F.3d 67, 70 (1st Cir. 2000). If the General Counsel meets this burden, the Union must prove, by a preponderance of the evidence, that it would have discharged Johnson even if she had not engaged in the protected activity. Id. at 71. The Union maintains that the ALJ and the Board misapplied the Wright Line standard by wrongly placing the burden of persuasion on the Union. We disagree. The ALJ decided that the NLRB had proved that Loux was motivated to discharge Johnson because she engaged in protected concerted activity. Following the dictates of Wright Line, the ALJ then determined that the Union had failed to prove that Loux would have discharged Johnson regardless of her protected activity. Our reading of the ALJ's decision leads us to conclude that the ALJ simply determined that the General Counsel proved its case and the Union did not. This was not legal error.

-14-

Second, we ask whether substantial evidence supports the Board's finding that Loux discharged Johnson because she engaged in protected concerted activity. We answer yes. The record shows that the General Counsel presented strong proof that Johnson's complaining about the leafletting schedule motivated Loux to discharge Johnson. After Loux announced that the leafletting campaign could last up to four months, that employees could not take any vacations until it was concluded, and that employees would work seven days per week during the campaign, Johnson began to discuss schedule changes openly with co-employees. Johnson then advocated to Loux on behalf of the employees for the ability to switch shifts or be allowed to work four-hour shifts on one weekend day so that they could enjoy one day off per week.

In addition to proof that Johnson engaged in concerted activity and that Loux knew about this activity, the record shows that the General Counsel also presented a very strong case that Loux's motivation for discharging Johnson was rooted in Johnson's protesting the leafletting schedule. For instance, Leary rated Johnson's performance as a researcher as very good and gave excellent marks for her ability to prioritize work, set work goals, and manage work schedule/time. Loux did not disagree with Leary's assessment of Johnson's performance as a researcher and did not have anything critical to say when meeting with Johnson. This evaluation took place in May 1999. Soon after, in July 1999, Loux

initiated the leafletting campaign against the Hilton and Johnson began voicing complaints about the leafletting schedule. That is when Loux became extremely critical of Johnson's performance and attitude. Within a few weeks of the campaign's start and Johnson's complaints about the schedule, Loux told Leary, "I'm really at the end of my rope with Emma Johnson and I'm thinking very seriously about terminating her." Loux specifically mentioned Johnson's complaints about the leafletting schedule. A week after that private incident, Loux publicly displayed anger when Johnson sought to discuss scheduling at a staff meeting. After slamming her hand on the table, Loux stated, "We cannot talk about scheduling. There are going to be no changes. . . . I am the boss! I make the rules!" When Loux privately met with Johnson to discharge her, Loux said that she could not tolerate the attitude that Johnson displayed on the picket line. After Johnson left the private meeting with Loux, Johnson told Wu that Johnson was discharged because she complained about the Hilton campaign. Lang, the Union's director of organizing, corroborated what Loux said to Johnson when Lang later told Wu that Johnson was discharged because of her complaints about the Hilton campaign. Thus, we conclude that substantial evidence supports the Board's decision that the General Counsel proved that a motivating factor in the Union's discharge of Johnson was her protected concerted activity.

Substantial evidence also supports the Board's rejection of the Union's defense that it would have discharged Johnson regardless of her protected concerted activity. In considering this defense, the ALJ rightly concentrated on Loux's credibility, since only Loux had the authority to discharge Johnson. Of course, testimony from other witnesses either supported or contradicted Loux's testimony, but it is important to remember that the ALJ had the benefit of watching and listening to Loux's testimony when deciding the critical question of what motivated Loux to discharge Johnson. The ALJ found that Loux was not credible: "I do not believe Loux's testimony as to the reasons that she gave for Johnson's discharge." According to testimony credited by the ALJ, the only reason Loux gave at the time of discharge for discharging Johnson was Johnson's poor attitude on the picket line. The ALJ was free to eye with a good deal of suspicion any reasons later generated during litigation. See NLRB v. Waco Insulation, Inc., 567 F.2d 596, 601 (4th Cir. 1977) ("We believe that it is extremely unlikely that the reason for [an employee]'s discharge was due to poor work performance [i.e., the employer's proffered reason] since it was not articulated as a reason for his discharge at the time he was fired.").

The Union admits that Johnson's poor attitude during the leafletting activities was a reason for her discharge. The ALJ recognized that "this criticism is inextricably related to the fact

that Johnson made herself a pest in Loux's eyes by continually complaining about the . . . leafletting schedule." The ALJ expounded: "Johnson may have been an irritant to Loux because she was challenging the schedule; but that irritating activity by Johnson is protected by" § 7 of the NLRA. The record in this case simply does not allow us to second-guess the ALJ's findings on this point.

The Union also maintains that Loux was motivated to discharge Johnson because she was a poor researcher. But the ALJ specifically credited Johnson's testimony that at the time of discharge, Loux praised Johnson as "a really good researcher." Thus, the record supports the ALJ's rejection of this asserted reason for discharging Johnson.

We also acknowledge that the ALJ decided that the strength of the General Counsel's case in proving Loux's unlawful motive in discharging Johnson detracted from the Union's defense. It was entirely appropriate for the ALJ to recognize that the stronger the General Counsel's case, the harder it was for the Union to meet its burden to prove that it would have discharged Johnson regardless of her protected concerted activity. Cf. Sears, Roebuck & Co. v. NLRB, 349 F.3d 493, 503 (7th Cir. 2003) ("The [General Counsel's] case and the [employer's] affirmative defense available under Wright Line are linked: the weaker the [General Counsel's] case, the easier it is for the employer to establish

that it would have taken the adverse action regardless of the employee's protected activity."). When the ALJ rejected Loux's testimony in favor of Johnson's, it became very difficult for the Union to argue that the General Counsel failed to prove that Loux was motivated to discharge Johnson because of her protected concerted activity.

The Union argues that because Parker's testimony corroborates parts of Loux's testimony, the ALJ was required to adopt Parker's and Loux's testimony over Johnson's and Leary's. We disagree. Only Loux had the authority to discharge Johnson and only Loux knew what motivated her to do so. The ALJ did not find Loux credible and rejected all of her testimony that conflicted with Johnson's testimony. Morever, substantial evidence shows that Loux told Leary that she wanted to discharge Johnson, in part, because of her leafletting complaints. The ALJ was free to conclude that this testimony revealed Loux's unlawful motivation. The ALJ was also free to conclude that Loux displayed her motivation for discharging Johnson at the discharge meeting when Loux gave one reason for the discharge—Johnson's conduct on the picket line. The same reason for the discharge appeared when Johnson told Wu why she was discharged and when Lang told Wu about the discharge. A consistent theme runs through the credited testimony and supports the ALJ's finding that Johnson's protected concerted activity motivated Loux to discharge her.

III.

For the reasons discussed, we grant the General Counsel's application for enforcement of the Board's order and deny the Union's petition for review.