# United States Court of Appeals
## For the First Circuit

Nos. 15-1653, 15-1721

BOCH IMPORTS, INC., D/B/A BOCH HONDA,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.

PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT
OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before

Barron and Stahl, Circuit Judges,
and Sorokin,<sup>*</sup> District Judge.

Anthony D. Rizzotti, with whom Gregory A. Brown and Littler Mendelson, P.C., were on brief, for petitioner.
Jared Cantor, with whom Kira Dellinger Vol, Supervisory Attorney, Richard F. Griffin, Jr., General Counsel, Jennifer Abruzzo, Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Linda Dreeben, Deputy Associate General Counsel, were on brief, for respondent.

June 17, 2016

---

<sup>*</sup> Of the District of Massachusetts, sitting by designation.

**BARRON**, **Circuit Judge**. This case concerns cross-petitions from an order that the National Labor Relations Board ("Board") issued in 2015. The Board ruled that a Massachusetts car dealership was liable for unfair labor practices in two respects. The Board concluded that the dealership was liable for certain unlawful workplace policies because the dealership failed to take the steps necessary to "repudiate" them, even though the dealership had revised the policies to make them compliant with federal labor law. The Board also concluded that the dealership's ban on employees' wearing pins, insignia, and "message clothing" in the workplace constituted an unfair labor practice even in the ban's revised form.

In petitioning for review, the dealership principally argues that the Board's findings are not supported by substantial evidence and that the Board applied its precedents arbitrarily and capriciously. The Board responds that it reasonably applied its precedents to the facts that it supportably found, both with respect to the steps that an employer must take to repudiate a formerly unlawful workplace policy and with respect to the circumstances that may justify the imposition of a dress ban as sweeping as the one at issue here. The Board therefore requests that we grant its petition for enforcement of its order.

We conclude that the Board's rulings are supported by substantial evidence and by reasoning that is not arbitrary and

capricious.  We thus deny the dealership's petition for review and grant the Board's petition for enforcement.

I.

This dispute concerns a Honda dealership located in Norwood, Massachusetts.  That dealership is operated by Boch Imports, Inc., which does business as Boch Honda.  For ease of reference, we will refer to the petitioner simply as "Boch."

We start our review of the lengthy history of this case with the response provoked by Boch's issuance of an employee handbook in July 2010.  Less than a year after the handbook's publication, in 2011, the Boch employees' collective bargaining representative -- the International Association of Machinists & Aerospace Workers, District Lodge 15, Local Lodge 447 (the "Union") -- asserted that some of the workplace policies contained in that handbook infringed upon employees' right to organize in violation of the National Labor Relations Act ("NLRA").  29 U.S.C. § 151, et seq.  [J.A. 1, 77-81]

Discussions between Boch and the Union over the possible revision of those policies ensued.  While those discussions continued, the Union filed a formal charge against Boch with the Board.  That charge alleged that Boch maintained workplace rules in its 2010 employee handbook that "interfere[d] with, restrain[ed] or coerce[d] employees in the exercise of" their

rights to organize under Section 7 of the NLRA, in violation of Section 8(a)(1) of the NLRA.[1]  29 U.S.C. § 158(a)(1).

In September 2011, however, Boch's collective bargaining unit decertified the Union.  The discussions between Boch and the Union thus came to an end.  But Boch then began to discuss the possible revision of the policies contained in the 2010 handbook with the Board's regional office.

Prior to Boch's making any revisions, the Board, on December 31, 2012, issued a formal complaint against Boch that stemmed from the Union's charge.  See id. § 160(b); 29 C.F.R. § 102.15.  The Board's complaint alleged that certain portions of the policies in Boch's 2010 employee handbook violated Section 8(a)(1) of the NLRA.  For example, the complaint alleged that Boch's 2010 social media policy impermissibly threatened employees with disciplinary action if they engaged in conduct -- even when off Boch's property and off the clock -- that could potentially have a "negative effect on the Company."  [J.A. 16, 209]

The Board's complaint identified the following policies in the 2010 handbook as containing unlawful provisions: social

---

[1] Section 7 of the NLRA provides:
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."  29 U.S.C. § 157.

- 4 -

media, confidential and proprietary information, discourtesy, inquiries concerning employees, solicitation and distribution, and dress code and personal hygiene (the "2010 Policies"). [J.A. 2-5] We note that the portion of the dress code and personal hygiene policy that restricts the wearing of pins, insignias, and message clothing figures particularly prominently in these cross-petitions. We refer to that portion of the policy throughout as, simply, the "dress ban."

In March 2013, before the Board had made any ruling on the complaint, Boch issued a revised employee handbook that altered the workplace policies that were the subject of the Board's complaint. The 2013 handbook was certified as received by all of the employees affected by the 2010 Policies. [J.A. 82-83]

Notwithstanding the publication of the revised handbook, the Board issued an amended complaint against Boch on June 17, 2013. The amended complaint stated that Boch was liable for violating Section 8(a)(1) of the NLRA by having "maintained," from December 21, 2011 to about May 2013, specified portions of the 2010 Policies (the "2010 Policy Provisions"), and by maintaining, from about May 2013 to present, a revised version of the 2010 dress ban. [J.A. 15-16] The 2013 version of the dress ban provided: "Employees who have contact with the public may not wear pins, insignias, or other message clothing." [J.A. 251]

The Administrative Law Judge ("ALJ") held a telephone conference call with the parties regarding the amended complaint. [Blue Br. 9] Boch argued on that call that the allegations in the complaint concerning the 2010 Policy Provisions were moot in light of the revisions Boch made to those provisions and Boch's publication of the revised handbook in 2013. The ALJ agreed with Boch that "it would not effectuate the policies of the [NLRA] to spend time on" those no longer operative policy provisions. See Boch Imports, Inc. v. NLRB ("Boch"), 362 NLRB No. 83, 2015 WL 1956199, at *8 (2015) (ALJ opinion appended to Board opinion). The ALJ thus indicated that the parties should focus on the lawfulness of the 2013 version of the dress ban.

At the hearing on the complaint, the General Counsel for the Board stipulated that, with the exception of the 2013 dress ban, the policies contained in Boch's 2013 employee handbook did not violate Section 8(a)(1) of the NLRA. That is, the General Counsel stipulated that, save for the dress ban, each of the 2010 Policy Provisions had been revised in a manner that made them compliant with the NLRA.

Following the hearing, and after receipt of the parties' briefs, in which the Board in its brief argued that Boch's revision of the 2010 Policy Provisions did not render moot the issue of Boch's liability for those provisions, the ALJ issued its ruling on January 13, 2014. The ALJ explained that a "careful

- 6 -

examination" of Board precedent "convince[d] [the ALJ] that [his] initial impression [of the mootness of the 2010 Policy Provisions] was incorrect." Id. The ALJ held that certain of the 2010 Policy Provisions violated Section 8(a)(1) of the NLRA at the time they were set forth in the 2010 handbook, insofar as employees would "reasonably construe the language [in those provisions] to prohibit Section 7 activity." Id.

The ALJ further held, on the basis of the Board's decision in Passavant Memorial Area Hospital ("Passavant"), 237 NLRB No. 21, 1978 WL 7798, (1978), that the publication of the revised handbook in 2013 did not suffice to relieve Boch of liability under the NLRA for the 2010 Policy Provisions because, although Boch had revised them, Boch had failed to "repudiate" them. Boch, 2015 WL 1956199, at *8. In particular, the ALJ found that "[w]hile there has been an adequate publication [of the revised provisions] to the affected employees, the dress code provision remains as is in the handbook, and there have been no assurances by [Boch] that, in the future, it will not interfere with employees' Section 7 rights." Id.

The ALJ then addressed the 2013 dress ban. The ALJ held that Boch's interest in maintaining its public image did not justify the imposition of a "blanket" ban on the wearing of pins, insignias, and message clothing without regard to such factors as size and message. Id. The ALJ held, however, that Boch's

interests in promoting workplace safety and preventing damage to vehicles did justify the imposition of a comprehensive ban on pins. Id. Thus, the ALJ held that Boch violated Section 8(a)(1) of the NLRA by maintaining, from about May 2013 onward, a ban on insignias and message clothing. Id.

The ALJ ordered Boch to rescind the non-compliant parts of its 2013 dress ban. Id. The ALJ also ordered Boch to post a notice at every Boch dealership and related retail business. Id. Such notice was to advise employees that they had certain rights under Section 7 of the NLRA; that some of the policies in Boch's 2010 employee handbook interfered with those rights; that Boch had since rescinded the unlawful policy provisions; that Boch would rescind the portion of the 2013 dress code ban prohibiting the wearing of insignias and message clothing; and that Boch would not impinge on employees' Section 7 rights in any related manner in the future. Id.

Boch appealed to the Board, challenging its rulings as to both repudiation and the 2013 dress ban. On April 30, 2015, the Board issued its decision. The Board held that the language of the 2010 Policy Provisions would be reasonably construed by employees as impinging on their Section 7 rights.[2] Id. at *1 &

_____

[2] In its cross-exceptions to the ALJ's ruling, the Board contended that the ALJ failed to make findings regarding the legality of certain provisions of Boch's 2010 social media policy

n.3.  The Board also held that those provisions, though they had been revised in a manner that the Board's General Counsel had stipulated rendered them lawful (save for the dress ban), were not repudiated within the meaning of Passavant and other Board precedents.  Id.  The Board based that conclusion on, among other things, its findings that Boch "neither notified its employees of its unfair labor practices nor provided them assurances that it would not interfere with their Sec. 7 rights in the future."  Id.  The Board therefore held Boch liable for having maintained the 2010 Policy Provisions until their revision in 2013.  Id.

The Board next turned to the 2013 dress ban.  The Board held that, for the reasons stated by the ALJ, Boch's interest in maintaining its public image did not justify the ban.  Id. at *2 & n.6.  But the Board disagreed with the ALJ's ruling that Boch's interests in promoting workplace safety and preventing damage to vehicles justified the imposition of a ban on pins.  Id. at *3 & nn.7-8.  The Board held that the ban on pins was not narrowly tailored to address those concerns.  Id.

The Board then ordered Boch to issue a much more detailed notice than the ALJ had required.  See id. at *4-5.  The Board required Boch to issue a notice that included specific descriptions

---

that were referenced in the Board's amended complaint.  On appeal, the Board found merit in that contention and concluded that the social media provisions were unlawful.  Boch, 2015 WL 1956199, at *1.

of the policy provisions found to be unlawful, apprised employees of their Section 7 rights, and assured employees against future interference with such rights.  Id.  However, the Board required that Boch post notices only at the "facility or facility it owns or operates . . . , at which the rules found unlawful were or are in effect" (i.e., the Norwood dealership).  Id. at *4.

One Board member dissented.  He concluded that Boch was not liable for the 2010 Policy Provisions because, on his view, Boch had done enough to repudiate those provisions.  Id. at *6 (Johnson, dissenting).  He reasoned that "where there has been no overt interference with Section 7 activity and an employer has taken pains to fully comply with the Act through a line-by-line revision of its handbook in cooperation with the Region and with its approval, Passavant need not be applied with hyper-technical precision."  Id.

The dissenting Board member also disagreed with the Board regarding its ruling on the 2013 dress ban.  He agreed that the dress ban, save for the portion banning pins, was too broad to be justified by the dealership's interest in maintaining its public image.  Id.  But he concluded that Boch's ban on pins -- though also not justified by Boch's interest in maintaining its public image -- was justified by the dealership's interest in preventing damage to vehicles.  Id.

- 10 -

We first consider Boch's challenge to the Board's ruling as to repudiation.  We then turn to Boch's challenge to the Board's ruling as to the 2013 dress ban.

## II.

We review the Board's decision for "mistakes of law, lack of substantial evidence to support factual findings, and arbitrary or capricious reasoning."  The Edward S. Quirk Co., Inc. v. NLRB, 241 F.3d 41, 42 (1st Cir. 2001); 29 U.S.C. § 160(e).  We accord the Board considerable deference, as "[w]e may not substitute our judgment for the Board's when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  Yesterday's Children, Inc. v. NLRB, 115 F.3d 36, 44 (1st Cir. 1997) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).  Where the Board adopts the conclusions and reasoning of the ALJ, we review the ALJ's reasoning as if it were that of the Board.  See McGaw of P.R., Inc. v. NLRB, 135 F.3d 1, 3 n.3 (1st Cir. 1997).  Where the Board adopts the conclusions of the ALJ but not the ALJ's reasoning, we review only the Board's reasoning.

## III.

In petitioning for review of the Board's repudiation ruling, Boch does not challenge the Board's ruling that the 2010 Policy Provisions were unlawful when they were imposed.  Boch

contends instead that the Board erred in concluding that Boch took insufficient steps to repudiate those provisions. We first describe the legal framework for deciding what constitutes repudiation and how the Board applied that framework to these facts. We then explain why we conclude that, contrary to Boch's contentions, the Board did not err in concluding that Boch failed to repudiate.

**A.**

Longstanding Board precedent requires that in order for an employer to be relieved of liability for a workplace policy that constitutes an unfair labor practice, an employer must repudiate that policy, even if the employer has since discontinued that policy or revised it in a manner that makes it compliant with the NLRA. See Passavant, 1978 WL 7798, at *2; Sequoyah Spinning Mills, 194 NLRB No. 179, 1972 WL 4224, at *30 (1972); Pepsi-Cola Bottling Co. of Sioux City ("Pepsi"), 170 NLRB No. 58, 1968 WL 18830, at *5 n.4 (1968); see also Lily Transp. Corp. & Robert Suchar ("Lily"), 362 NLRB No. 54, 2015 WL 1439930, at *1, *3 (2015). The "fundamental remedial purpose" served by this repudiation requirement is to protect employees from the potential lingering effects of an unfair labor practice, even though that practice has been halted. Webco Industries, Inc., 327 NLRB No. 47, 1998 WL 866665, at *2 (1998).

Consistent with the repudiation requirement's underlying purpose, the Board has made clear that the employer is obliged to "signal[] unambiguously" to employees that the employer "recognizes that it has acted wrongfully, that it respects their Section 7 rights, and that it will not interfere with those rights again." Id. Without these signals, "there is no assurance that the coercive effects of the initial wrongful conduct will not linger in the workplace." Id.

The Board relied here on Passavant, in which the Board explained that, to be effective, the employer's notice of repudiation must be "adequate[ly] publi[shed]" to the affected employees, must not be accompanied by the "proscribed conduct on the employer's part after the publication," and "should give assurances to employees that in the future their employer will not interfere with the exercise of their Section 7 rights." Passavant, 1978 WL 7798, at *2 (citation omitted). Passavant also explained that the notice of repudiation to employees "must be 'timely,' 'unambiguous,' 'specific in nature to the coercive conduct,' and 'free from other proscribed illegal conduct.'" Id. (quoting Douglas Div., The Scott & Fetzer Co., 228 NLRB No. 124, 1977 WL 8482, at *15 (1977), enf. denied on other grounds by NLRB v. Douglas Div., The Scott & Fetzer Co., 570 F.2d 742 (8th Cir. 1978)); see also Sequoyah Spinning Mills, 1972 WL 4224, at *1, *30 (noting, in concluding that notice of repudiation was ineffective,

- 13 -

that the notice "fail[ed] to repudiate or even make any reference to the coercive conduct" at issue); Pepsi, 1968 WL 18830, at *5 n.4 ("It is no defense to the 8(a)(1) violations that on April 25 [employer] posted a notice disavowing any unfair labor practices it may have committed. This disavowal was ineffective . . . because it was ambiguous in that it did not specify the conduct to which it had [sic] reference.").

In this case, the Board concluded that Boch did not meet its burden to show that it had effectively repudiated the 2010 Policy Provisions. See Lily, 2015 WL 1439930, at *3 (noting that the employer bears the burden of demonstrating repudiation). The Board based that conclusion on its findings that Boch "neither notified its employees of its unfair labor practices nor provided them assurances that it would not interfere with their Sec. 7 rights in the future."[3] See Boch, 2015 WL 1956199, at *1 n.3.

Boch contends that the Board's repudiation ruling cannot stand because its findings are not supported by substantial

---

[3] The Board stated in its opinion that it agreed with the ALJ's decision regarding repudiation, and the ALJ, as we have noted, based that decision in part on its finding that Boch continued to engage in proscribed conduct after the publication of the 2013 handbook, in that the dress ban continued to be unlawful. See Boch, 2015 WL 1956199, at *1, *8. Given the Board's independent grounds for concluding that there was no repudiation, we focus, as the parties do, on those other grounds for the Board's repudiation ruling, without addressing whether Boch's maintenance of the dress ban provides a separate basis for concluding that Boch failed to repudiate the 2010 Policy Provisions, only one of which involved a dress ban.

evidence; because its conclusions of law rely on an arbitrary and capricious application of the Board's repudiation precedents; and because the Board's ruling in this case cannot be squared with the Board's independently expressed policy in favor of remedying unfair labor practices through cooperative means. We disagree as to each contention.

**B.**

In challenging the evidentiary basis for the Board's repudiation ruling, Boch takes aim at the Board's findings as to Boch's failure to provide assurances to employees and as to Boch's failure to notify employees about the unlawful nature of the 2010 Policy Provisions. Both Board findings, however, are supported by substantial evidence.

First, as to assurances, Boch notes that the 2013 employee handbook did set forth certain guarantees to employees as to how they would be treated. Those guarantees, however, do not speak specifically to the Section 7 rights to organize that the Board determined were infringed by the 2010 Policy Provisions. The guarantees Boch points to instead concern protection of employees from discrimination and harassment in the workplace and Boch's commitment to promoting ethical conduct. The guarantees make no reference to Section 7 or the rights guaranteed by the NLRA at all. [Blue Br. 23, J.A. 223-24, 255] And, indeed, the guarantees were not changed from the 2010 handbook to the 2013

- 15 -

handbook to reflect Boch's liability for the 2010 Policy Provisions. [J.A. 181, 186-88, 212] We thus do not see how Boch's retention of the 2010 guarantees in the 2013 handbook shows that the Board lacked substantial evidence for its finding that Boch failed to assure its employees that it would not interfere with the Section 7 rights implicated by the provisions set forth in the 2010 handbook that the Board found violated the NLRA.

As to notice of unlawful conduct, Boch notes that the 2010 Policy Provisions (save for the dress ban) were, as the Board's General Counsel stipulated, revised to be compliant with the NLRA and that the revised provisions were contained in the 2013 handbook that was distributed to all affected employees. But the simple fact -- unchallenged by Boch -- is that Boch did nothing more in terms of notification than to provide copies of the revised handbook to employees. There is no evidence that Boch informed employees that some of the policies contained in the 2010 handbook were -- or even may have been -- unlawful, or even that parts of those policies could be construed as impinging on employees' Section 7 rights. Nor did the ALJ state otherwise in finding that there had been an "adequate publication" of the 2013 handbook. See id. at *8.

Thus, the Board's finding that Boch did not "notif[y] its employees of its unfair labor practices" -- let alone provide the sort of "unambiguous" and "specific" notice that Passavant

requires -- is supported by substantial evidence. And that is true even if we were to somehow construe the ALJ to have mistakenly found that in "adequate[ly] publi[shing]" the 2013 handbook, Boch actually did notify employees, albeit implicitly, of its unfair labor practices. See C.E.K. Indus. Mech. Contractors, Inc. v. NLRB, 921 F.2d 350, 355 (1st Cir. 1990) (noting that, where the Board's findings conflict with those of the ALJ, we are to defer to the Board's findings so long as they are supported by substantial evidence).

Boch does also appear to argue that, notwithstanding the Board's findings as to assurances and notification, the Board lacked substantial evidence to support its conclusion that Boch needed to do more than it did to repudiate the 2010 Policy Provisions. But that argument is not a challenge to whether the evidence in the record supports the Board's findings about the limited nature of Boch's assurances and notification to employees. That argument is instead a challenge to the Board's application to these facts of prior Board precedents concerning what constitutes repudiation. And so we consider that challenge in connection with Boch's challenge to the Board's treatment of its own repudiation precedents, which is the issue to which we now turn.[4]

---

[4] Boch contends that it was lulled by the ALJ into not presenting evidence of repudiation. Boch thus requests that this Court, at a minimum, remand to the Board so that Boch can have the

We start with Boch's apparent contention that the repudiation requirement that generally applies to unfair labor practices does not apply -- or does not apply with the same vigor -- to the practices at issue here. But Boch provides us with no basis for reaching that conclusion.

Board precedent is clear that an employer may violate Section 8(a)(1) of the NLRA through the promulgation of a workplace policy that either explicitly or implicitly restricts employees' Section 7 rights. See Guardsmark, LLC v. NLRB, 475 F.3d 369, 374 (D.C. Cir. 2007) (citing Martin Luther Memorial Home, 343 NLRB No.

---

opportunity to develop the record and so the Board can make fact findings regarding repudiation on the basis of a more developed record. [Blue Br. 23 n.3] But Boch did not make that lulling argument to the Board on appeal from the ALJ's ruling. Nor did Boch request that the Board remand to the ALJ for greater development of the record regarding repudiation. [Gray Br. 11 n.6; Red Br. Add. 11-14] Accordingly, Boch's never-before-raised argument about its right to further factual development is not properly before us. See 29 U.S.C. § 160(e); NLRB v. Saint-Gobain Abrasives, Inc., 426 F.3d 455, 459 (1st Cir. 2005). Moreover, we note that, prior to the ALJ's ruling, the Board stated in its brief to the ALJ that the "mere discontinuance of alleged unfair labor practices does not render [a] case moot" absent "dissipati[on] [of] the effects of [such] practices and preventi[on] [of] the recurrence of similar unlawful conduct in the future," and yet Boch does not appear to have addressed that contention. Thus, given that Boch chose not to give either the ALJ or the Board a chance to consider the lulling issue in the first instance, we see no basis on this record for concluding on our own that Boch's lulling contention has any merit. [Board Br. to ALJ 29] Nor do we see any basis in the record for the dissent's speculative assertions about what must have transpired below. See infra at 40, 42 n.16, 43.

75, 2004 WL 2678632, at *1-2 (2004)).  Board precedent is equally clear that a workplace policy implicitly restricts employees' Section 7 rights if -- as the Board found here -- employees would reasonably construe the policy as restricting such rights, even if that policy need not be so construed and even if that policy was neither intended to be applied nor in fact applied in an impermissibly restrictive fashion.  Id.[5]  And, finally, Board precedent is clear that the requirement of repudiation applies to violations of just this implicit type.  See Lily, 2015 WL 1439930, at *1, *3.

Although Boch asserts that employees would derive no benefit from Boch's "notifying [them] that [they] could have construed defunct policies to restrict their Section 7 rights," the Board's application of Passavant and related Board precedent to these facts was not arbitrary and capricious.  Such application was instead perfectly in accord with these precedents.  Nor does Boch contend that these precedents were founded on arbitrary and

---

[5] The dissent states that, in determining whether Boch employees "would reasonably construe" the 2010 Policy Provisions as impinging on their Section 7 rights, the ALJ "inexplicably abandoned the proper legal standard in the process of attempting to apply it," infra at 45, because, with respect to 2 of the 15 challenged provisions, the ALJ purportedly focused on whether employees "could" -- rather than "would" -- construe the provisions to be unlawful.  We have no reason to resolve the issue, as this argument is neither one Boch itself made below nor one Boch makes in its petition to this Court.  [Red Add. (Cross-Exceptions); A.R. 41-43]

capricious reasoning -- that is to say, Boch makes no developed argument that the benefits employees derive from repudiation generally would not also apply here.[6]  The Board's ruling thus certainly falls within the not inconsiderable realm of reasonable discretion that an agency possesses to determine how to apply its own past precedents.  See Harrington v. Chao, 372 F.3d 52, 58 (1st Cir. 2004) (observing that only a "narrow band of administrative determinations . . . fail the deferential arbitrary and capricious test").

Boch next contends, somewhat relatedly, that the Board acted unreasonably in relying on Lily and Lytton Rancheria of California d/b/a Casino San Pablo & Unite Here Local 2850 ("Casino San Pablo"), 361 NLRB No. 148, 2014 WL 7330998 (2014).  In each case, the Board concluded that an employer's removal of unlawful policies from its employee handbook, without more, did not suffice to relieve the employer of liability for those policies.  Lily, 2015 WL 1439930, at *1, *3; Casino San Pablo, 2014 WL 7330998, at *6.

Boch contends neither case applies here given the history of cooperation between Boch and the Board.  But the Board reasonably concluded otherwise.  Lily and Casino San Pablo each

_____

[6] With regard to Lily in particular, Boch simply notes, in its reply brief, that no Court of Appeals has reviewed the case or cited it positively.  But that is not a sound argument for concluding that the reasoning in Lily was arbitrary and capricious.

drew on Passavant and focused on the steps the employer took (or did not take) to disavow its prior unlawful policies. See Lily, 2015 WL 1439930, at *1, *3; Casino San Pablo, 2014 WL 7330998, at *6. Neither case indicated that the employer's cooperation or non-cooperation with the Board in excising the unlawful workplace policies from the employee handbook mattered in determining whether the employer had done enough to repudiate those policies.

We also find no merit in Boch's contention that the Board acted unreasonably in failing to give weight to two Board cases in which the Board found there was effective repudiation -- Extendicare Health Services, Inc. d/b/a Rivers Bend Health & Rehab. Serv. & Amer. Fed'n of State, Cnty., and Mun. Emps., AFL-CIO, Local 913 ("Rivers Bend"), 350 NLRB No. 16, 2007 WL 1946628 (2007), and The Broyhill Co. & District No. 162, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO ("Broyhill"), 260 NLRB No. 183, 1982 WL 24367 (1982). Instead, we conclude that the Board reasonably distinguished each of those cases on their facts. See Boch, 2015 WL 1956199, at *1 n.3.

In Rivers Bend, the Board stated that "the Passavant decision indicates that what an employer must do to [repudiate] a violation may depend on the nature of the violation." 2007 WL 1946628, at *2, *18. The Board in that case concluded that the employer repudiated an unfair labor practice involving an unbargained-for increase in meal prices. Id. There, the employer

notified employees that the price increase was "not legal," that it was abandoning the increase, and that it would compensate employees for the increase.  Id.

The conclusion in Rivers Bend that such notice was sufficient to constitute effective repudiation in view of the "relatively minor importance" of the unfair labor practice, id., does not help Boch.  As the Board supportably found, Boch did less than the employer did in Rivers Bend, as Boch provided no notice of its prior unlawful conduct to employees.

Similarly, in Broyhill, the Board concluded that an employer "did all that it reasonably could do to disavow the unlawful conduct" by notifying employees that a supervisor of the company "may have acted in an improper manner" and by assuring employees that it would not again engage in the sort of restrictive activity engaged in by the supervisor.  Broyhill, 1982 WL 24367, at *2, *8-9, *11.  But, as the Board supportably found, Boch did less than the employer in that case, too, as Boch neither "notified its employees of its unfair labor practices nor provided them assurances that it would not interfere with their Sec. 7 rights in the future."  See Boch, 2015 WL 1956199, at *1 n.3.

In sum, the Board drew reasonable distinctions with past Board precedents finding repudiation, and the Board reasonably found Board precedents finding no repudiation to be on point.  We thus conclude, contrary to Boch's contentions, that the Board acted

well within its discretion in applying its repudiation precedents. See Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d 1112, 1120 (D.C. Cir. 2010) (noting that agency actions may "stand without elaborate explanation where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears").

**D.**

That brings us to Boch's contention that the Board's repudiation ruling is arbitrary and capricious for the additional reason that it supposedly conflicts with the Board's previously stated policy in favor of encouraging the remedying of unfair labor practices without litigation.  We do not agree.

The Board has emphasized that it is important to elicit employers' voluntary cooperation, as such cooperation helps to effectuate the goals of the NLRA expeditiously.  See, e.g., Broyhill, 1982 WL 24367, at *2.  And, in this case, Boch did work with the Board in conducting a "line-by-line" revision of its 2010 handbook, Boch, 2015 WL 1956199, at *6 (Johnson, dissenting), with the result that the Board stipulated to the lawfulness of the revised policy provisions (save for the dress ban).

Nevertheless, Boch clearly did not reach an agreement with the Board that encompassed whether Boch had repudiated the 2010 Policy Provisions.  The Board thus reasonably concluded that Boch's cooperation with the Board in revising its employee handbook

is simply not germane to the determination of whether Boch is liable for those provisions insofar as Boch failed to repudiate them. In other words, the fact that Boch cooperated with the Board in revising the 2010 Policy Provisions is essentially a non sequitur, as Boch did not cooperate on the issue that matters, which involves providing adequate notice and assurances to employees. See Boch, 2015 WL 1956199, at *1 n.3 ("[W]e value cooperation to revise problematic rules and prompt remedying of unfair labor practices. But merely revising the unlawful rules does not remedy the unfair labor practices at issue, absent notice to the affected employees that the violations occurred and that they will not be repeated."). And, as we have explained, Board precedent supports that conclusion. See Lily, 2015 WL 1439930, at *1, *3; Casino San Pablo, 2014 WL 7330998, at *6.

**IV.**

We now turn to Boch's challenge to the Board's ruling that Boch's 2013 dress ban -- which prohibits "employees who have contact with the public" from wearing "pins, insignias, or other message clothing" -- violates Section 8(a)(1) of the NLRA. We first describe the Board's key precedents in this area. We then address Boch's challenge to the Board's application of its own precedents to these facts.

- 24 -

**A.**

The Board has made clear that employees are "presumptively entitled under Section 7 to wear union insignia and other attire during" work hours.  Pathmark Stores, Inc. & Local 342-50, United Food and Commercial Workers Union, AFL-CIO ("Pathmark"), 342 NLRB No. 31, 2004 WL 1531761, at *2 (2004).[7]  But

---

[7] The dissent questions whether it is correct to apply such a presumption to dress rules without regard to whether the rules are tailored to working time and working areas.  See infra at 48-56.  In so doing, the dissent notes that the Board applies a different set of presumptions to rules prohibiting union solicitation and distribution.  In that distinct context, the Board has developed a set of legal rules in which restrictions on solicitation and distribution are deemed presumptively lawful unless the restrictions proscribe solicitation during nonworking time or proscribe distribution during nonworking time in nonworking areas, in which case the restrictions are deemed presumptively unlawful.  Beth Israel Hosp. v. NLRB, 437 U.S. 483, 492-93 (1978).  But we do not see why -- and the dissent does not explain why -- it necessarily would be unreasonable for the Board to apply a different set of presumptions to dress rules than it would apply to solicitation and distribution rules, given the differential nature of the employee activity each type of rule addresses.  Active solicitation and distribution diverts employee time, while the passive wearing of clothes and accessories obviously does not.  And the inherently intrusive nature of the former activities distinguishes them from the latter as well.  Thus, given that an employer has a particularly legitimate interest in preventing employees from spending their work time on non-work-activities, the basis for treating solicitation and distribution differently is not hard to identify.  See Republic Aviation Corp. v. NLRB, 324 U.S. 793, 802-03 & nn.7, 10 (1945) (implicitly contrasting these two contexts).  To the extent the dissent suggests that dress rules should be deemed presumptively lawful only when confined to public areas, we note that the 2013 dress ban is not tailored to public areas such as the showroom or selling floor.  In any event, Boch does not challenge this aspect of the Board's ruling, and so we have no reason to call into question, without proper briefing, the presumption that the Board employed and that Boch accepts.  See

the Board has also made clear that an employer may limit that activity, as Boch did with the 2013 dress ban, if the employer shows that there are "special circumstances" that justify the limitations imposed. Id.

Special circumstances exist, according to the Board, "when the[] display [of union attire] may jeopardize employee safety, damage machinery or products, . . . or unreasonably interfere with a public image that the employee has established," among other things. Starwood Hotels & Resorts Worldwide, Inc., d/b/a W San Diego and Hotel, Employees and Restaurant Employees Int'l Union, Local 30, CLC ("Starwood"), 348 NLRB No. 24, 2006 WL 2826434, at *3 (2006). Limitations on union attire, however, generally must be tailored to advance the special circumstance, and the burden is on the employer to establish both that special circumstances exist and that those circumstances justify the breadth of the limitations imposed. See id. at *3-4.

We note at the outset that different considerations may apply when employers proscribe all adornments, including union adornments, than would apply when employers proscribe only certain types of adornments (for example, "provocative" adornments), which

---

Beth Israel, 437 U.S. at 493. Nor do we think it proper to take the Board to task, as the dissent appears to do, for failing to provide a sufficient justification for a presumption that the employer in this case has not seen fit to challenge. Infra at 55 n.20.

- 26 -

may, on a case-by-case basis, include union adornments.  Compare NLRB v. Harrah's Club, 337 F.2d 177, 178 n.2, 180 (9th Cir. 1964) (all-encompassing ban), with Davison-Paxon Co., Div. of R.H. Macy & Co. v. NLRB, 462 F.2d 364, 368 n.11 (5th Cir. 1972) (limited ban on "anything that might offend or be controversial to a customer").  The 2013 dress ban is of the former variety, and we analyze the ban with that understanding in mind.

**B.**

In challenging the Board's ruling, Boch appears to ask for a blanket seal of approval for its blanket dress ban.[8]  To that end, Boch first contends that the record shows that it reasonably believed that the 2013 dress ban would further its interest in promoting its public image and that the Board had no basis for requiring Boch to show anything more.  But, in pressing this contention, Boch relies chiefly on a single D.C. Circuit case that considered whether an employer was justified in preventing public-facing employees from wearing a particular piece of attire with a particular message -- there, a t-shirt likening employees to

---

[8] Boch notes that it provided evidence of "specific examples of message clothing that would interfere with [its public] image," but Boch does so in the context of arguing that the Board should have concluded that Boch demonstrated special circumstances that suffice to justify the 2013 dress ban in its entirety.  [Blue Br. 29]  Boch thus appears to ask that we vacate the Board's order on the ground that Boch has shown that the 2013 dress ban is lawful in all its applications.  Boch makes no argument that the Board's remedy, requiring Boch to rescind the entire 2013 dress ban, is unduly broad.

prisoners. See So. New England Tel. Co. v. NLRB ("New England"), 793 F.3d 93, 96-97 (D.C. Cir. 2015) (invoking t-shirt's "straightforward" message and employer's consequently reasonable belief as to the impact of that message on customer relations). This case, by contrast, concerns a Board judgment about the propriety of an employer's general ban on pins, insignias, and message clothing.[9]

Nor do we find persuasive Boch's contention that it is no different from the employer in Starwood and thus that the Board was required by Starwood to rule other than it did. In Starwood, the Board found that a hotel employer demonstrated special circumstances to justify the employer's specific enforcement of its general ban on uniform adornments, which meant that the employer could lawfully prevent its uniformed employees from wearing a particular union button in public areas. See Starwood,

---

[9] The other cases Boch cites in connection with its contention that Boch's interest in its public image justifies the dress ban are similarly distinguishable. See Medco Health Solutions of Las Vegas, Inc. v. NLRB, 701 F.3d 710, 717-18 (D.C. Cir. 2012) (concluding that employer satisfied its burden of establishing special circumstances to justify ban on particular t-shirt mocking company program); Pathmark, 2004 WL 1531761, at *3 (concluding that employer satisfied burden of establishing special circumstances to justify ban on attire bearing particular union logo, where logo "reasonably threatened" customer relationships by giving customers the impression that they were being cheated); In re Bell-Atlantic-Pennsylvania, Inc., 339 NLRB No. 1084, 2003 WL 22012216, at *5 (2003) (concluding that employer satisfied burden of establishing special circumstances to justify ban on particular t-shirt "depicting employees as squashed and lying in a pool of blood").

2006 WL 2826434, at *2-4.  But, in so ruling, the Board did not simply conclude that the employer's general dress ban was lawful in all its applications, including the one at issue, because its imposition would advance (however marginally) the employer's interest in promoting its public image.  See Starwood, 2006 WL 2826434, at *2-4; see also Nordstrom, 1982 WL 23740, at *6-7.  The Board instead examined whether the restriction at issue was tailored to the employer's particular interest in promoting its public image.  See Starwood, 2006 WL 2826434, at *2-4 (concluding that uniformed employee's wearing of a particular union button in public areas "would have interfered with [hotel]'s use of a particular . . . uniform (professionally-designed all-black shirt, slacks, and apron) to create a special atmosphere for hotel customers"); see also Nordstrom, 264 NLRB No. 95, 1982 WL 23740, at *6-7 (1982) (concluding that fashion company, which generally prohibited employees from wearing unfashionable dress, could not prohibit the wearing of a particular union button, as the button at issue was "not of a size and intrusiveness which unreasonably interferes" with the company's "long cultivated image of fashion" (emphasis added)).

        This discerning approach accords with the Board's charge, which is to strike a balance between the employer's legitimate business interests and the statutorily protected workplace rights to organize.  See Beth Israel Hosp. v. NLRB, 437

U.S. 483, 504 (1978) (noting that "it is the Board upon whom the duty falls in the first instance to determine the relative strength of the conflicting interests [of employers and employees] and to balance their weight").  The Board thus may reasonably choose to require employers to show why a dress rule is tailored to stamp out those aspects of employee dress that would "<u>unreasonably</u> interfere" with the employer's public image.  <u>Starwood</u>, 2006 WL 2826434, at *3 (emphasis added).

Against that backdrop, the Board distinguished <u>Starwood</u> by explaining that the employer in that case provided evidence "demonstrat[ing] that its <u>strict</u> uniform policy was intended to create a specific and unique environment," while Boch provided no "comparable" evidence.  <u>Boch</u>, 2015 WL 1956199, at *2 n.6 (emphasis added).[10]  And the record backs up the Board's conclusion regarding the comparative weakness of Boch's showing.

In <u>Starwood</u>, the employer prohibited uniformed employees from wearing any adornments on their uniforms, "including

---

[10]  The Board did also indicate that <u>Starwood</u> was distinguishable from the present case for the reason that Boch's attire was not unique in the dealership-specific sense (as opposed to in the company-specific sense), but we do not read the Board's decision to depend on that distinction, given the Board's independent grounds for rejecting Boch's reliance on <u>Starwood</u>. See <u>Boch</u>, 2015 WL 1956199, at *2 n.6 (noting, in the context of describing the "narrow factual circumstances" that the Board found to justify the result in <u>Starwood</u>, that the employer in <u>Starwood</u>, unlike Boch, adhered to a "strict" uniform policy and "intended to create a specific and unique environment").

sweatbands, scarves worn as belts, and professional association pins," except for a small, company pin that they were required to wear. Starwood, 2006 WL 2826434, at *2. And the employer in Starwood sought thereby to "provid[e] an alternate hotel experience" and to cultivate a unique, fantasy-like ambiance. Id.

By contrast, the Board supportably found that the 2013 dress ban -- unlike the dress ban involved in Starwood, 2006 WL 2826434, at *2-4 -- applies both to employees who are required to wear uniforms (service advisors, service technicians) and to employees who are not required to wear uniforms (salespeople, finance and administrative staff).[11] The Board also supportably found that Boch did not provide evidence that its dress code "was intended to create a specific and unique environment," as Boch's aim was to cultivate a general, professional environment. Boch, 2015 WL 1956199, at *2 n.6, *3. In other words, the Board reasonably found that Boch was not comparable to the employer in Starwood because Boch was generally promoting professionalism and not something more distinctive and because Boch was willing to tolerate a fair amount more variation in dress as to the employees to whom the ban applies.

_____

[11] Boch does not challenge the Board's finding that the dress ban applies to finance and administrative staff. And these personnel are required only "to dress in a manner consistent with their level of responsibility and/or public contact" (that is, to wear business casual attire). [J.A. 250]

- 31 -

In light of these findings, the Board acted neither arbitrarily nor capriciously -- much less in defiance of "common sense," as the dissent suggests, infra at 69 -- in holding that Starwood did not control the outcome here. As the Board reasonably concluded, Boch simply failed to explain why the additional increment of variation that might arise from non-uniformed employees' wearing a small and unobtrusive union pin (for example) would unreasonably interfere with the general professional environment Boch sought to create. See Beth Israel, 437 U.S. at 504 ("The Board [i]s, of course, free to draw an inference from the[] facts in light of its experience, the validity of which 'depends upon the rationality between what is proved and what is inferred.'") (quoting Republic Aviation Corp. v. NLRB, 324 U.S. 793, 805 (1945)); see also Nordstrom, Inc., 1982 WL 23740, at *4 (noting as significant in cases of this nature "[t]he requirement of uniformity of dress and concomitant severe restriction on employee display of other personal adornment[s]" (emphasis added)).[12]

---

[12] The same reasoning explains why we do not find persuasive Boch's reliance on the Sixth Circuit's decision in Burger King Co. v. NLRB, 725 F.2d 1053 (6th Cir. 1984). There, too, the employer appeared to have imposed an all-encompassing dress ban only on employees who were subject to a strict uniform policy as opposed to on employees who were subject only to a basic dress code. Id. at 1054-55. We note, in any event, that Burger King has since been called into doubt by the very circuit that promulgated that decision. Meijer, Inc. v. NLRB, 130 F.3d 1209, 1215 (6th Cir.

In challenging that ruling, Boch makes no argument about why, in light of the workplace rights that employees presumptively enjoy, the Board's distinction between the facts of this case and those of Starwood is an unreasonable one to draw. After all, it stands to reason that the more distinctive the public image the employer seeks to cultivate, and the less variation in dress the employer permits in promoting that image, the more likely any deviation in employee dress will unreasonably interfere with the employer's promotion of that image. But, rather than explain why the distinguishing facts on which the Board relied are not relevant ones, Boch simply asserts, in conclusory fashion, that it is just like the employer in Starwood. Boch thus provides no basis for overturning the Board's ruling.[13]

---

1997) (noting that "not a single relevant opinion from our Circuit, subsequent to Burger King, has adopted that case's per se approach to [the special circumstances inquiry]"). NLRB v. Harrah's Club, which Boch also cites, is similarly distinguishable. See 337 F.2d at 178 n.2, 180 (noting that company was permitted to prohibit public-facing, uniformed employees from wearing adornments).

[13] The dissent does attempt to do what Boch does not, by offering a variety of arguments about why the Board's differential treatment of Boch and the employer in Starwood is insufficiently respectful of Boch's legitimate business interests. But, in doing so, the dissent appears to give no weight to the competing concern that, absent such differential treatment, bans on protected activity that do not actually serve an employer's claimed legitimate business interests would be imposed. And since the Board is, in general, charged with bringing its expertise to bear on just such tradeoffs in workplace matters, we see no reason to address these newly presented arguments about how to make such tradeoffs, when Boch never presented them to the Board and when Boch failed to set forth those arguments in its petition to us.

To be sure, as Boch notes, Boch neither promulgated its dress ban in response to union activity nor enforced its dress ban in a discriminatory manner. [Blue Br. 28] But while the presence of these circumstances may constitute grounds for invalidating a dress ban, see Pay'n Save Corp. v. NLRB, 641 F.2d 697, 701 (9th Cir. 1981), it does not necessarily follow that the absence of these circumstances constitutes a ground for upholding a dress ban of this breadth. And Boch has not directed our attention to any Board precedent that supports such a proposition. Thus, the fact that Boch did not promulgate the dress ban in response to union activity and the fact that Boch has not enforced the ban in a discriminatory manner are not themselves facts that require the Board to uphold a ban of this breadth.

## c.

In sum, Boch does not explain why the facts on which the Board relied to distinguish this case from Starwood supply an arbitrary basis for the Board's ruling. See infra at 63-70. Nor has Boch directed our attention to any precedent in which the Board -- or any Circuit Court -- has held that an employer's general public image warrants the imposition of a dress ban of this breadth on non-uniformed employees. We thus cannot say the Board acted unreasonably in concluding that, in accordance with Board precedent, Boch failed to demonstrate special circumstances that suffice to justify this dress ban.

That brings us to Boch's final contention: that its interests in promoting workplace safety and preventing damage to vehicles justified its outright ban on pins. The Board, departing from the ALJ, concluded that the ban on pins was not "narrowly tailored" to address those concerns because the ban applied to "employees who have contact with the public, regardless of whether they come into contact with [Boch's] vehicles," "no evidence support[ed] actual safety concerns related to pins worn by public facing employees," and "image . . . was [Boch's] justification for the entire [2013 dress ban], including its ban on pins." Boch, 2015 WL 1956199, at *3. But here, too, we see no basis for rejecting the Board's ruling.

During the administrative proceedings, Boch expressed concern that an employee's pin could fall into an engine (assuming the employee is working under the hood of a car) and that an employee's pin could inadvertently damage the leather inside of a car or scratch the car's paint. [J.A. 115-17, 136, 139, 149, 159-60] In that connection, Boch rightly notes that the absence of evidence that a risk has materialized does not necessarily mean that the risk is not a real one.

But the Board's ruling does not rest either on a rejection of the notion that cars and pins might not mix or an acceptance of the notion that an employer must show actual harm

from a risk to justify a measure designed to mitigate that risk. Rather, the Board came to the more limited, and adequately supported, conclusion that Boch's ban on pins was not narrowly tailored to address the safety and damage risks that Boch itself identified, insofar as the ban was neither crafted narrowly to target, nor was intended to target, Boch's claimed interests in workplace safety and preventing damage to vehicles.

The Board found that the 2013 dress ban "applies to employees who do not typically have contact with vehicles (e.g., finance and administrative personnel)." The Board also found that the ban applies to employees "during their performance of tasks that do not require vehicle contact." Id. Boch does not squarely challenge these findings. Rather, Boch contends that the record does not preclude the possibility that such persons may in fact interact with vehicles in a way that would raise safety and damage concerns. But the burden was on Boch to prove that special circumstances justified the scope of the ban, and it was thus incumbent on Boch to explain why a ban that applied as broadly as the Board found this one to apply was warranted.

For that reason, the key fact about the record is that it does not contain evidence that makes unreasonable the Board's conclusion that a more tailored restriction on pins -- either with respect to the employees subject to the restriction, the times when the restriction would apply, or both -- would have adequately

served Boch's claimed interests in safety and damage prevention. In fact, consistent with the Board's conclusion that Boch had not met its burden of showing that the ban was adequately tailored to the interests Boch claimed that the ban served, the Board supportably found that the safety and damage prevention rationales for the sweeping ban on pins were "post hoc invention[s]."[14] Boch, 2015 WL 1956199, at *3 n.7; see also In re E & L Transp., 331 NLRB No. 83, 2000 WL 972084, at *1 (2000) (concluding that employer's purported interests in promoting safety and preventing damage could not justify dress ban, where employer imposed rule for retaliatory reasons and not for the reasons cited).  [J.A. 207]

In that regard, the record shows that the 2010 version of the ban permitted employees to wear company-provided pins and appeared under the auspices of Boch's "Dress Code and Personal Hygiene Policy."  The stated purpose of that policy, however, had nothing to do with safety or preventing vehicle damage; rather, the purpose was "to ensure that employee dress and personal hygiene [we]re consistent with their job function and the Company's

---

[14] The Board also noted, as "addition[al]" support for its conclusion that Boch's image served as the real driving force for the dress ban, that the "Safety" sections of the 2010 and 2013 handbooks did not reference the dress ban. Boch, 2015 WL 1956199, at *3 n.7.  Boch notes that the "Safety" sections "d[id] not purport to be [] exhaustive account[s] of [Boch]'s various safety provisions," [Blue Br. 36] but, even so, the Board did not act unreasonably in invoking that fact as added support for its conclusion that Boch's purpose in enacting the ban on pins was to advance its image interest and not its safety interest.

interest in presenting a professional image to the public." [J.A. 207]

Moreover, the record shows that Boch, after consulting with the Board, revised the ban by prohibiting the wearing of all pins (including company-provided ones), because Boch did not want to appear to be sanctioning only company-sponsored messages. [J.A. 104-05] In doing so, however, Boch retained all other aspects of the ban, including the ban's placement in the dress code section of the revised handbook, which section set forth the same image-driven purpose as the prior handbook. [J.A. 251]

Thus, the record provides scant basis for concluding, as Boch contends, that a ban on pins of this breadth was needed, either for reasons of safety or for reasons of preventing damage to vehicles. Rather, the uncontroverted record shows only that the ban applies to some categories of employees who would not seem to interact with vehicles with any frequency, that until recently Boch allowed all of its employees to wear company-provided pins, and that Boch apparently changed the scope of the ban on pins for reasons unrelated to safety and damage prevention.[15]

---

[15] The Board and Circuit precedents Boch cites in support of its position regarding the ban on pins each involved very different facts, as the employer in those cases imposed less sweeping restrictions. See, e.g., Albis Plastics & United Steelworkers of Amer., District #12, AFL-CIO, CLC, 335 NLRB No. 74, 2001 WL 1203209, at *4 (2001) (concluding that company's ban on unauthorized stickers on employees' hardhats was warranted, where

**V.**

For the reasons given, we **<u>grant</u>** the Board's petition for enforcement and we **<u>deny</u>** Boch's petition for review.

**-Concurring and Dissenting Opinion Follows-**

---

evidence showed that unauthorized stickers would reduce the visibility of the hardhat itself or interfere with the visibility of authorized stickers containing important safety information); Va. Elec. & Power Co. v. NLRB, 703 F.2d 79, 81-84 (4th Cir. 1983) (concluding that employer did not violate NLRA simply by expressing preference that employee not wear a "large, brightly colored, and potentially provocative button" in a public lobby, in light of the potential for public conflict between competing unions).

**STAHL**, <u>Circuit Judge</u>**, Concurring in part and dissenting in part**. In this case, a newly certified union alleged that some of Boch's 2010 workplace policies were too broad, such that employees might believe their labor rights were restrained. Boch began discussions with the union over possible revisions to the policies, but, within the year, employees filed a petition to decertify the union. Boch turned discussions to the Board's regional office to ensure that its policies complied with federal law. Before discussions were complete, the Board issued a formal complaint based on the union's charge. Nonetheless, Boch continued to work hand-in-hand with the Board's regional office to address its concerns and soon issued a revised set of workplace policies. Despite these efforts--and the Board's purported aim of working with employers to remedy violations--the Board maintained the breadth of its complaint and argued that Boch had failed to repudiate its 2010 policies.

With respect to the allegedly violative policies contained in Boch's 2010 employee handbook, I concur in the result but write separately to make clear that my concurrence is limited to the narrow evidentiary record and legal arguments before us. With respect to the majority's decision regarding Boch's "dress ban" (or, what most of us might simply call a "dress code"), however, I dissent because I believe that Boch has demonstrated "special circumstances" warranting its policy.

- 40 -

As the majority points out, Boch did not challenge the Board's ruling that the 2010 policy provisions at issue were unlawful when imposed.  Ante, at 11.  Instead, Boch contends that it adequately "repudiated" the alleged violations by issuing the revised 2013 handbook.  I agree with the majority that, based on the evidentiary record and legal arguments before us, Boch has failed to show that the Board erred in rejecting this argument.

In order for an employer's repudiation of prior conduct to be effective, the repudiation "must be 'timely,' 'unambiguous,' 'specific in nature to the coercive conduct,' and 'free from other proscribed illegal conduct.'"  Passavant Mem'l Area Hosp., 237 NLRB 138, 138 (1978).  The Board also examines whether the employer has provided "assurances" to employees that there will not be future interferences with their rights.  Id. at 138-39.

Boch cites cases wherein repudiation was held to be effective despite various Passavant factors only being implicitly and/or partially satisfied.  See In River's Bend Health & Rehabilitation Serv. ("River's Bend"), 350 NLRB 184, 184, 193 (2007) (holding repudiation effective where employer posted memorandum implicitly conceding violation and implicitly providing assurances against future violations); Broyhill Co., 260 NLRB 1366, 1366-67 (1982) (holding repudiation effective where employer posted notice sufficiently disavowing violation and including "we

will not" language that is traditionally employed in Board notices). But, as the majority points out, these cases miss the mark. There is a difference between arguing that you have implicitly satisfied individual <u>Passavant</u> factors and arguing that the mere cessation of an ongoing violation constitutes an "implicit" repudiation. Such an interpretation would make the very concept of repudiation meaningless. Because Boch did not even advise its employees that some of its 2010 policies "<u>may have been</u>" overly broad, <u>ante</u>, at 16, I agree that the Board did not err in finding a lack of adequate repudiation.[16]

---

[16] Member Johnson's warning that the <u>Passavant</u> factors should not be applied with "hyper-technical precision" is well taken nonetheless. <u>Boch Imports, Inc.</u>, 362 NLRB No. 83, 2015 WL 1956199, at *6 (Apr. 30, 2015) (Johnson, dissenting). "[W]hat an employer must do to cure a violation may depend on the nature of the violation." <u>River's Bend</u>, 350 NLRB at 193. This is because proportionality avoids punishing cooperation. Otherwise, a company facing a dubious complaint over a somewhat-vague policy would have to (1) declare a violation in stark terms (which would damage the company's reputation but provide little extra benefit or notice to employees), or (2) stand on the contested policy (which would vindicate the company but frustrate the purposes of the Act). The resources of the Board and the business alike are squandered in such situations.

Taxpayer funds are likewise misspent when the Board fails to advise a cooperating employer that litigation can be avoided through repudiation. Boch fully cooperated in the revision of its policies and was understandably surprised when the Board doggedly pursued liability nonetheless. It is true that Boch "did not reach an agreement with the Board" regarding repudiation, <u>ante</u>, at 23, but it appears that the Board did not even raise this issue until the final throes of litigation. If the Board actually values cooperation, there is little reason to litigate an expired policy without first simply asking the employer to post a repudiation notice. Only in the rarified air of appellate review could this

I write separately to emphasize that my concurrence is limited to the narrow factual record and legal arguments in the parties' petitions. From what we have before us, the record appears to have been improperly truncated. As Boch rightly points out, and the majority acknowledges, the ALJ seemed to remove the challenges to the 2010 policies from the table altogether during an initial hearing on the complaint. Ante, at 6. After evidence had been heard, the Board, in its briefing to the ALJ, resuscitated its challenges to the 2010 policies. Ante, at 6. Without giving Boch an opportunity to add to the record, the ALJ found that "[a]lthough I originally agreed with counsel for the Respondent that it would not effectuate the policies of the Act to spend time on these allegations which had already been remedied, a careful examination of the Board's cases, convinces me that my initial impression was incorrect." Boch Imports, Inc. ("Boch Imports"), 362 NLRB No. 83, 2015 WL 1956199, at *8 (Apr. 30, 2015).

Boch argues, quite persuasively, that it was lulled by the ALJ into not presenting evidence of repudiation and that we should remand to the Board and permit Boch the opportunity to develop the record. Unfortunately, this argument was not made below and has been raised for the first time to us in Boch's

---

argument be deemed, as my colleagues put it, a "non sequitur." Ante, at 24.

- 43 -

petition. As such, it is not properly before us and we must work with the factual record as its stands. Ante, at 17-18 n.4.

Apart from Boch's failure to preserve an opportunity to develop the record, it also failed to preserve a challenge to the underlying premise of liability. Section 7 of the Act, 29 U.S.C. § 157, guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), in turn, makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]."

In examining workplace rules, the Board first determines whether the rule explicitly restricts activity protected by Section 7. Martin Luther Mem'l Home, Inc. ("Martin Luther"), 343 NLRB 646, 646 (2004). If it does, the rule is unlawful. Id. If the rule does not, however, then there is only a violation if "(1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights." Id. at 647. In evaluating the challenged rule, the Board must give the rule a reasonable reading,

must refrain from reading particular phrases in isolation, and must not presume improper interference with employee rights. Id. at 646.

The ALJ in this case acknowledged that the rules at issue did not explicitly restrict Section 7 activity, were not promulgated in response to union activity, and had not been applied to restrict the exercise of Section 7 rights. Boch Imports, 2015 WL 1956199, at *8. As such, the ALJ rightly recognized that the policies would only violate Section 8(a)(1) if employees would reasonably construe them as prohibiting Section 7 activity. Id. The ALJ then purported to apply that law to the 2010 policies.

But here, the ALJ misstepped and inexplicably abandoned the proper legal standard in the process of attempting to apply it. For example, the ALJ found that particular aspects of Boch's confidential and proprietary information rule "could lead an employee to believe that his ability to discuss his terms and conditions of employment with fellow employees, the media or a union were limited." Id. (emphasis added). Similarly, the ALJ found that "the provision prohibiting any activity which could harm the image or reputation of the company is clearly susceptible of being understood to limit employees in their right to engage in a strike, work stoppage or similar forms of concerted activities." Id. (emphasis added).

This is not merely a matter of semantics. One can imagine a number of rules that would not reasonably be construed by employees as limitations on Section 7 rights even if they could be construed as limitations on Section 7 rights. The reasonably-construe standard is a narrow exception to the rule that neutral, reasonable workplace policies that do not explicitly restrict Section 7 rights generally do not violate Section 8(a)(1). Like the exceptions for purportedly "neutral" policies that are adopted in response to union activities or enforced in targeted ways, the purpose of the reasonably-construe exception is to catch those rare policies that, while facially neutral and legitimate, can be understood as little else but a restriction upon Section 7 rights.

By striking policies that merely could be construed to restrict Section 7 rights, the ALJ transformed the reasonably-construe standard from a narrow exception into a freestanding, and highly intrusive, test. Such a standard would capture a far wider sweep of plainly legitimate business policies in its maw and would radically expand the Board's authority. In effect, such a standard would grant the Board wide-ranging license to draft and impose its own preferred workplace policies under the threat of litigation.

The Board has previously disavowed this approach. In Martin Luther, for example, the Board declined to find a Section 8(a)(1) violation where the employer had adopted rules that "serve[d] legitimate business purposes" and that would not be

construed by a reasonable employee to prohibit Section 7 conduct.

See 343 NLRB at 647.  The Board further held:

> Where, as here, the rule does not refer to Section 7 activity, we will not conclude that a reasonable employee would read the rule to apply to such activity simply because the rule could be interpreted that way.  To take a different analytical approach would require the Board to find a violation whenever the rule could conceivably be read to cover Section 7 activity, even though that reading is unreasonable.  We decline to take that approach.

Id.  Therefore, the burden never should have shifted to Boch to show repudiation because, in my view, the ALJ failed to properly apply the correct standard of liability in the first place.[17]

---

[17] Although "any ambiguity in [an employer's workplace policy] must be construed against the [employer] as the promulgator of the rule," Lafayette Park Hotel, 326 NLRB 824, 828 (1998) enf'd 203 F.3d 52 (D.C. Cir. 1999), the Board traditionally has exhibited some skepticism about allowing ambiguity to form the basis for liability under the reasonably-construe standard, see id. at 827 (footnote omitted) (holding that a ban on employees "fraternizing" with guests on hotel property was not ambiguous despite the undefined term because "[e]mployees would recognize the legitimate business reasons for which such a rule was promulgated, and would not reasonably believe that it reaches Section 7 activity").  The Board's normal approach seems to be that ambiguity will not necessarily make a rule more likely to be construed as a restraint on Section 7 rights, see id., but that an employer cannot save itself from a rule that would reasonably be construed as restrictive by relying upon ambiguity as a defense, see id. at 828 (holding that a rule requiring employees to leave the "premises" immediately after the completion of their shift violated Section 8(a)(1) because employees would reasonably read the rule as covering parking areas and other outside areas despite respondent's argument that it did not intend outside areas to fall within the scope of the term "premises").

Yet, as with Boch's failure to preserve its evidentiary objections, Boch failed to sufficiently raise this issue before us or below.[18]  With these limitations in mind, I concur in the judgment with respect to Boch's 2010 policies.

## II.

The majority also upholds the Board's decision that Boch violated Section 8(a)(1) with its dress code policy and that Boch failed to demonstrate "special circumstances" justifying the allegedly unlawful policy.  Because I take a fundamentally different view of the law in this area, I respectfully dissent.

## A.

To begin its analysis, the majority observes that employees are "presumptively entitled under Section 7 to wear union insignia and other attire during" work hours.  Ante, at 25 (quoting Pathmark Stores, Inc. & Local 342-50, United Food and Commercial Workers Union, AFL-CIO ("Pathmark"), 342 NLRB 378, 379 (2004)).  Although the majority seems to unquestioningly accept this basic premise, I do not.  As I shall discuss further below, I am willing to assume without deciding that such a presumption applies in this case (since Boch did not raise a challenge to it), but I feel

---

[18] The majority points out that "[w]e have no reason to resolve the issue, as this argument is neither one Boch itself made below nor is it one Boch makes in its petition to this Court."  Ante, at 19 n.5.  Certainly so.  That is, of course, why I concur in the judgment with respect to Boch's 2010 policies.  But judges need not be silent bystanders to the misapplication of the law.

compelled to comment on the silent, unexplained creep of the Board's presumptions and the resulting subtle, but consequential, shift in the burdens of litigation.

The "central purpose of the Act [is] to protect and facilitate employees' opportunity to organize unions to represent them in collective-bargaining negotiations." Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 609 (1991). As the Supreme Court has long recognized, "the right of employees to self-organize and bargain collectively [under Section 7] necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." Beth Israel Hosp. v. NLRB ("Beth Israel"), 437 U.S. 483, 491 (1978) (emphasis added). At times, employees' exercise of Section 7 rights in the workplace may come into conflict with their employer's legitimate interest in controlling its property and operating its business. To balance the conflicting interests in such cases, the Board, with Supreme Court approval, has developed certain legal presumptions. See id. at 491-95, n.10. One of these presumptions is the right to wear union-related paraphernalia while at work as a form of "concerted action," i.e., to communicate about self-organization rights or show support for a union. See Republic Aviation Corp. v. NLRB ("Republic Aviation"), 324 U.S. 793, 803-04 (1945); Asociacion Hosp. del Maestro, Inc. v. NLRB ("Maestro"), 842 F.2d 575, 577 (1st Cir. 1988).

- 49 -

According to the Board's more recent cases, this means that a restriction upon the right to wear such paraphernalia at work is presumptively unlawful, absent a showing of "special circumstances" by the employer to justify the imposition. See Starwood Hotels & Resorts Worldwide, Inc. ("Starwood"), 348 NLRB 372, 373 (2006). For example, an employer may restrict union insignia and apparel "when their display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, as part of its business plan, through appearance rules for its employees." Bell-Atl.-Pa., Inc. ("Bell-Atlantic"), 339 NLRB 1084, 1086 (2003), enf'd sub nom., Commc'ns Workers of Am., Local 13000 v. NLRB, 99 F. App'x 233 (D.C. Cir. 2004).

Note the difference, however, between the legal presumption sanctioned by the Supreme Court and the supposed right now read into Section 7 by the Board. The former recognizes a presumptive right to wear union-related paraphernalia while at work as a manifestation of employees' right to communicate effectively regarding self-organization at the jobsite. The latter, on the other hand, holds as presumptively unlawful any restrictions upon the wearing of union-related paraphernalia, even during working hours or while the employee is on the job. This is a subtle, but undoubtedly significant, shift. As the Ninth Circuit

has observed, while the "Supreme Court has held that the wearing of union buttons comes under the heading of 'other concerted activities,'" it did not intend "to erect this into a rule which makes the wearing of union buttons per se a guaranteed right" at all times and in all places.  NLRB v. Harrah's Club ("Harrah's"), 337 F.2d 177, 179 (9th Cir. 1964).

In the realm of workplace restrictions upon union solicitation, for example, there is an established rule that policies restricting solicitation during nonworking time in nonworking areas are presumptively unlawful.  In Beth Israel, the Supreme Court reviewed a workplace restriction upon off-hours solicitation in a hospital cafeteria.  437 U.S. at 486.  The Court noted that "patient use of the cafeteria, is voluntary, random, and infrequent," and the Court found it "of critical significance that only 1.56% of the cafeteria's patrons are patients."  Id. at 502.  Thus, the Court reaffirmed that the Board could find restrictions on employee solicitation during nonworking time in nonworking areas to be presumptively violative of Section 8(a)(1).  See id. at 492-93, 508.

The Court contrasted this presumption with that utilized "[i]n the case of retail marketing establishments, including public restaurants, . . . [where] the Board has held that solicitation . . . may be prohibited on the selling floor at all times."  Id. at 493.  The presumption flips because, "[i]n the

retail marketing and restaurant industries, the primary purpose of the operation is to serve customers."  Id. at 506.  As such, a policy prohibiting solicitation on the selling floor is presumptively lawful because "solicitation in these areas, if disruptive, necessarily would directly and substantially interfere with the employer's business."  Id.

These offsetting presumptions strike a reasoned balance between employers' business prerogatives and employees' labor rights.[19]  Indeed, a prohibition tailored to employees who are on the clock and on the selling floor does not inappropriately suppress employees' Section 7 rights, because "it would be an unusual store or restaurant which did not have stockrooms, kitchens, and other nonpublic areas" wherein "employee solicitation of nonworking employees" not only could be permitted, but "must be permitted."  Id. (emphasis added).

In the realm of workplace restrictions upon union insignia, most of the seminal case law also reflects this logical and easily discernable line.  For example, Republic Aviation, which

---

[19] See Republic Aviation, 324 U.S. at 803 n.10 ("The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work.  It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours.  Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose." (emphases added) (quoting Peyton Packing Co., Inc., 49 NLRB 828, 843 (1943))).

is commonly cited for the presumptive right to wear union insignia absent special circumstances, dealt with a military-aircraft manufacturer. See 324 U.S. at 794. There, the Board applied a presumption that the button restriction at issue was unlawful and held that the employer had failed to demonstrate any evidence that wearing insignia had an adverse impact on the plant's normal operations. See id. at 801-04, n.7. Republic Aviation, however, dealt with an industrial business. The question of what presumption to apply to insignia restrictions for "public-facing" employees simply never arose.

The First Circuit's treatment of insignia in Maestro also implicitly recognizes this distinction. In Maestro, we recognized that "employees have the right to wear union-related insignia," but also recognized that "proscriptions against the wearing of union insignia in 'immediate patient care areas' are not presumptively invalid." 842 F.2d at 577. The workplace policy in Maestro was fatally flawed because the hospital had "promulgat[ed] and enforc[ed] a rule prohibiting its employees from wearing union insignia in all places and at all times." Id. at 575 (emphases added). This blanket prohibition was a presumptively unfair labor practice absent identification of any "specific threat to patient care that wearing union insignia in nonpatient-care areas posed." Id. at 577 (emphasis added).

Only in recent years has this distinction eroded. In Starwood, for example, the Board held that a hotel did not violate Section 8(a)(1) when it prohibited an employee from wearing a union button in public areas and when it prohibited another employee from wearing union stickers in the hotel kitchen (a nonpublic area), but did violate Section 8(a)(1) by prohibiting an employee from wearing a union button in other nonpublic areas. 348 NLRB at 372. The Board's explanation for these outcomes, however, strayed from the rule above. Rather than finding the ban presumptively lawful in public areas and presumptively unlawful in nonpublic areas, the Board presumed the ban was unlawful in all areas but then examined whether the hotel had shown "special circumstances" justifying the prohibition with respect to the public areas (i.e., an interest in its public image) and with respect to the nonpublic areas (i.e., an interest in food safety/sanitation). Id. at 373-76.

This new rule--that employees possess a presumptive right to wear union insignia at all times and in all places--is not an exercise of the Board's expertise or an application of the Board's experience in applying the principle of accommodation to particular classes of circumstances or categories of rules. See Beth Israel, 437 U.S. at 492 ("Accommodation between [employee-organization rights and employer-property rights] must be obtained with as little destruction of one as is consistent with the

maintenance of the other." (alteration in original) (quoting NLRB

v. Babcock & Wilcox Co., 351 U.S. 105, 112 (1956))).  Rather, this

"presumption" seems to be an abdication of the Board's role to

carefully balance employer and employee interests.[20]

---

[20] The majority rides to the Board's rescue and argues that I have not explained why it would be unreasonable for the Board to apply different presumptions to solicitation and insignia.  The majority then offers its own hypothetical explanations for the divergent treatment of solicitation and insignia.  See ante, at 25-26 n.7.  This misses the point entirely.

The Board must justify using different presumptions for solicitation and insignia.  Yet, instead of relying on its experience and expertise to explain the insignia presumption that it presently employs, the Board merely points to Republic Aviation and other such cases.  These cases do not support the Board's expansive interpretation, and the Board is not entitled to deference when it (mis)reads judicial decisions.  If the Board would like to extend the presumption from Republic Aviation to include public-facing industries, then the Board--not the majority--must undertake an "appraisal of normal conditions [in service, rather than] industrial[,] establishments" and adopt its new presumption after balancing the sector-wide interests of employers and employees.  Republic Aviation, 324 U.S. at 804; see also Beth Israel, 437 U.S. at 506 (noting that it is the Board's role to formulate "rules [that] str[ike] the appropriate balance between organizational and employer rights in the particular industry to which each is applicable") (emphasis added).  The majority's ruminations about why the Board might adopt different presumptions are irrelevant.

In fact, the majority's own speculative justifications only reinforce why it is important for the Board to base its presumptions on a real-world appraisal of costs and conditions.  The majority theorizes that the "passive" wearing of insignia "obviously" does not divert employee time or intrude upon the workplace.  Ante, at 25-26 n.7.  But experience has shown otherwise.  The uncritical (and perhaps unwitting) expansion of the insignia presumption has led to an interminable string of vague and unpredictable cases over just when, where, and why messaging attire goes "too far."  See post, at 59-62.  As these cases show, not only is it quite obvious that insignia can--and do--interfere with business, it is equally evident that the threats and burdens

In this case, Boch's dress code policy prohibited "employees who have contact with the public" from wearing "pins, insignias, or other message clothing." Perhaps an employee would interpret the rule to apply to "employees who have contact with the public" even when they are not on the job. Perhaps Boch left too few opportunities for employees at the jobsite to communicate and organize off the clock and out of the public eye. These might constitute grounds for liability. In my view, however, the Board has not offered any explanation why a prohibition on insignia for public-facing employees who are on duty is <u>presumptively</u> unlawful under Section 8(a)(1) in this retail business.

Because Boch did not challenge the Board's presumption, however, we must assume the policy is presumptively unlawful. The question then becomes whether Boch's justifications for its prohibition on messaging attire constitute "special circumstances" and overcome the presumption. Here, too, I part ways with my colleagues in the majority.

**B.**

Even if Boch's dress code policy were presumptively unlawful, I would hold that Boch has demonstrated "special circumstances" justifying its policy. That is because I believe

___

of litigation in this area can adversely impact employer interests. These are the kinds of industry-wide realities that must be considered by the Board <u>before</u> adopting a new, broadened presumption.

- 56 -

that an employer can demonstrate special circumstances as a matter of law if the employer reasonably believes that a dress code will enhance its public image and the employer shows that it has maintained, and neutrally enforced, a clear and consistent dress code policy for public-facing employees who are on duty. See Burger King Corp. v. NLRB ("Burger King"), 725 F.2d 1053, 1055 (6th Cir. 1984); Harrah's, 337 F.2d at 179.

The ALJ in this case recited the supposedly guiding precedent:

> In determining whether an employer, in furtherance of its public image business objective, may lawfully prohibit uniformed employees who have contact with the public from wearing union insignia, the Board considers the appearance and message of the insignia to determine whether it reasonably may be deemed to interfere with the employer's desired public image.

Boch Imports, 2015 WL 1956199, at *8 (quoting United Parcel Serv., 312 NLRB 596, 597 (1993)). The ALJ noted that "customer exposure to such insignia, alone, is not a special circumstance allowing the employer to prohibit such a display," id. (citing Meijer, Inc., 318 NLRB 50 (1995)), and found that Boch's "blanket prohibition" on messaging attire did not provide an opportunity to evaluate the "numerous factors that need to be weighed to determine whether a displayed item" threatens the employer's interest in its public image, "including [the] size [of the item] and the message thereon," id.

The Board affirmed the ALJ's analysis, id., at *2, and now argues in its petition that an employer's interest in its public image cannot constitute a "special circumstance" unless the employer demonstrates its deliberate cultivation of a particular image as part of its business plan and tailors the limitations to protect that image without overly impeding employees' rights. See Bell-Atlantic, 339 NLRB at 1086.

The majority holds that the Board did not err in applying these precedents, ante, at 34, but fails to examine whether these precedents are coherent or tenable in the first place. One of the primary "precedents" cited by the ALJ, for example, was reversed, and the Board's application for enforcement in that case was denied. See United Parcel Serv. v. NLRB, 41 F.3d 1068, 1073 (6th Cir. 1994).

To begin its analysis, the majority quickly disposes of the cases relied upon by Boch that deal with prohibitions on particular pieces of messaging attire. Ante, at 27-28. The majority is right to distinguish these cases;[21] however, in the

---

[21] See Pathmark, 342 NLRB at 379 ("Respondent had no policy on uniforms and had permitted employees to wear other union insignia . . . ."); Bell-Atlantic, 339 NLRB at 1085 ("Although employees do not wear uniforms and may wear T-shirts during working time, the Respondent's apparel standards direct supervisors to be aware of 'disruptive appearance' by employees . . . ."); id. at 1084 ("Respondent has historically permitted all of its employees represented by the Union to wear red union-sponsored T-shirts displaying the Union's logo."); S. New England Tel. Co. v. NLRB

process of doing so, the majority demonstrates precisely why a business like Boch might have legitimate reasons to adopt a broader dress code policy. That is because the Board's precedents regarding more limited bans on provocative attire offer little solace to businesses that wish to maintain a decent image while minimizing exposure to labor law liability.

By tacitly encouraging employers to adopt narrower policies limited to offensive or controversial messages, the Board and the courts have lured businesses into a legal bog. Such policies cannot be administered in any kind of predictable or coherent manner. Employers must examine each t-shirt, button, sticker, or hat and make an on-the-spot judgment call, in each instance, about whether a particular message in a particular context has "crossed the line." Thus, the employer risks liability every time human resources or in-house counsel draws that line (assuming the business can afford such experts) and bears the burden of proof to boot. And, of course, once that determination is made, employees are free to don a slightly altered piece of attire, leaving the employer in a quicksand of boundary-testing litigation.

---

("New England"), 793 F.3d 93, 97 (D.C. Cir. 2015) ("[T]he Board suggests that AT&T did not enforce its ban on unprofessional clothing in an evenhanded way . . . .").

The majority's own examples prove the point.  See ante, at 27-28, 28 n.9.  How "straightforward" of a message is too "straightforward"?[22]  Can an employee swap out a slogan that "mocks" a company program with a more gentle parody?[23]  If we replace a t-shirt depicting "employees as squashed and lying in a pool of blood" with one showing employees toiling under a heavy load, can it be worn on the selling floor over the employer's objection?[24]

The Board acknowledges that its approach has led to cases "turn[ing] on fine distinctions based on a balancing of respective statutory interests and on unique factual circumstances."  Bell-Atlantic, 339 NLRB at 1086.  But the Board's cases reveal a "standard" that is more subjective than anything else.

> [I]n United Parcel Service [I], the Board found that an employer could prohibit the wearing of a 2-1/2-inch conspicuous button worn on a uniform, but in United Parcel Service [II], the Board found that an employer could not prohibit the wearing of a small inconspicuous pin on a uniform.  In Evergreen Nursing Home, the Board found that an employer could prohibit the wearing of a conspicuous bright-yellow 2-1/4-inch button worn by nurses in patient-care areas, but in St. Luke's

---

[22] New England, 793 F.3d at 96-97 (invoking t-shirt's "straightforward" message and employer's consequently reasonable belief as to the impact of that message on customer relations).

[23] Medco Health Solutions of Las Vegas, Inc. v. NLRB, 701 F.3d 710, 717-18 (D.C. Cir. 2012) (concluding that employer satisfied its burden of establishing special circumstances to justify ban on particular t-shirt mocking company program).

[24] Bell-Atlantic, 339 NLRB at 1086 (concluding that employer satisfied burden of establishing special circumstances to justify ban on particular t-shirt "depicting employees as squashed and lying in a pool of blood").

Hospital, the Board found that an employer could not prohibit the wearing of a 2-1/4-inch button with conspicuous white and black lettering in light of other patient-care circumstances. In Noah's New York Bagels, the Board found that an employer could prohibit a phrase (added to company T-shirt) stating, "If it's not Union, it's not Kosher," but in Escabana Paper Co., the Board found that an employer could not prohibit buttons stating "Just Say NO-Mead" and "Hey Mead-Flex this." In Southwestern Bell Telephone Co., the Board found that an employer could prohibit a shirt stating, "Ma Bell is a Cheap Mother" but in Borman's Inc., the Board found that an employer could not prohibit a shirt stating, "I'm tired of bustin' my ass" alongside company name.

Id. (internal citations omitted). Even a manager aware of these cases will have difficulty making a contemporaneous assessment when an employee shows up wearing a union button that is 2-1/4-inches wide (rather than 2-1/2-inches wide), is a slightly-less-conspicuous shade of mustard (rather than a conspicuous bright-yellow), and is inscribed with an edgy (but not quite provocative) slogan. Pick wrong, and the employer will be liable for a labor-rights violation. Pick right, and the employee may return the following day with a slightly smaller and darker button. To businesses seeking to avoid liability, and courts seeking to ascertain administrable rules, the Board's standard is simply unworkable.

Next, the majority rejects Boch's reliance on Starwood, which dealt with a hotel's across-the-board ban on pins and other

"adornments." 348 NLRB at 372. According to the majority, the Board reasonably distinguished Starwood because the dress code in that case was meant "to create a specific and unique environment" and required employees to wear uniforms. Ante, at 30 (quoting Boch Imports, 2015 WL 1956199, at *2 n.6). Specifically, servers wore "professionally-designed all-black shirt[s], slacks, and apron[s]" in order to create a "special atmosphere" for customers. Starwood, 348 NLRB at 373.

The majority argues that Boch, on the other hand, only sought to "cultivate a general, professional environment" and applied its insignia ban to all public-facing employees, even though some had to wear uniforms (service technicians and service advisors), some had to wear a shirt and tie or Boch Honda jersey (salespeople), and some had to wear "business casual" (administrative and financial staff). See ante, at 31, 31 n.11.[25]

---

[25] More specifically, the policy stated that "[m]ale [non-uniformed] personnel [were] expected to wear dress shirts, dress slacks, and coordinated neckties" and "be mindful" that undershirts "not contain logos, wording, or designs which can be seen through a dress shirt." "Female [non-uniformed] personnel [were] expected to wear blouses and skirts or dress slacks, dresses, or pant suits and hosiery" according to detailed specifications. For example, dresses and skirts were "not to be worn shorter than 2 inches above the knee," heels were required to be "3 inches or shorter," and blouses or shirts were required to have "a conservative neckline" and could not "be any shorter than the person's waistline." Such shirts were to be worn "with a sweater or blazer if they are strapless, sleeveless, backless, or have very thin straps." Both genders were prohibited from wearing "[f]lannel, leather, vinyl, denim, spandex or athletic-related clothing" or "athletic-type footwear."

Thus, in the majority's view, Boch's desired public image was not "distinctive" enough and its "willing[ness] to tolerate . . . more variation in dress" meant that it could not justify prohibiting "the additional increment of variation" that would be created by its non-uniformed employees wearing buttons and other messaging attire.  Ante, at 31-32.

All of these arguments and points of distinction overlook one simple fact:  none of this is the Board's concern.  By rubber-stamping the Board's arbitrary infatuation with the uniqueness and uniformity of workplace dress codes, the majority has done little more than grant the Board the authority to play "fashion police."

With respect to "uniqueness," one might be left wondering why the Board has any authority whatsoever to second-guess Boch's style choices or Boch's judgment that its own customers will respond more favorably to a salesperson wearing a tie than a salesperson wearing a designer t-shirt.  Starwood, 348 NLRB at 372 n.4.  The legality of a dress code cannot credibly turn on whether the employer thinks "business casual" befits its image, ante, at 31 n.11, or whether the employer thinks a "professionally-designed all-black" outfit will do the trick, Starwood, 348 NLRB at 373.  That decision is distinctly beyond the proper role of the Board.  In fact, visitors to Boch Honda might be a bit perturbed if the company attempted to project a "trendy,

distinct, and chic look." Id. at 378. Yet, the majority seems untroubled by the suggestion that an employer's interest in creating a "professional environment" deserves less respect than an employer's interest in creating a "unique environment." Ante, at 31. In my view, these are equally legitimate business objectives and the Board's fixation on "distinctive" or "special" atmospheres is simply unsupportable.

Nor should the "uniformity" of an employer's chosen dress code carry such dispositive power. The majority makes much of the fact that salespeople and service technicians at Boch wear different outfits. See ante, at 31. But unless dealerships are required to put salespeople in coveralls or mechanics in ties (to preserve a "uniform" public image), I fail to see how Boch's decision to tailor its dress code options to employees' different roles poses any cause for concern.

According to the majority, once Boch opens the door to "business casual" and "tolerate[s] a fair amount [of] variation" in its dress code, Boch forfeits the ability to keep the door closed to "the additional increment of variation" caused by buttons and other messaging clothing. See ante, at 31-32. But all "increments of variation" are not created equal. Allowing employees to wear a variety of dress shirts will advance Boch's chosen image; allowing employees to wear a variety of buttons and

- 64 -

lanyards will undermine it.[26]  Indeed, the majority's increments-of-variation theory would hardly survive a real-world encounter with a wedding invitation:  "dressy casual" may admit of variation, but there is a difference between inviting guests to take off their ties and inviting guests to don pins protesting the bride's choice of groom.

In short, the Board seems to imply that employers cannot prevent employees from bombarding customers with colorful and personalized proclamations on the job unless the employer is attempting to strike a gimmicky or novel tone through the use of completely homogeneous and inflexible uniforms.

Boch's differentiated dress code requirements reflect its coherent, and reasonable, vision for a look that is professional and appropriate for a car dealership.  As other circuits have recognized, the Board may "dra[w] on a fund of knowledge and expertise all its own," but "that expertise is surely not at its peak in the realm of employer-customer relations." Medco Health Solutions of Las Vegas, Inc. v. NLRB, 701 F.3d 710, 717 (D.C. Cir. 2012).  The Board cannot honestly believe that an

---

[26] My colleagues' question as to how "a small and unobtrusive union pin" would interfere with a "professional environment," ante, at 32, begs a further question:  whether a slightly larger button with a pun about the company slogan would interfere with a "professional environment."  Once the clear and consistent policy is removed, Boch will be forced to engage in these subjective case-by-case evaluations, as discussed above.

employer's goal of creating and maintaining a reputation for professional service (both in style and substance) does not constitute a legitimate business interest.

> Most business establishments . . . try to project a certain type of image to the public. One of the most essential elements in that image is the appearance of its uniformed employees who furnish that service in person to customers. . . . [An employer] should not be required to wait until it receives complaints or suffers a decline in business to prove special circumstances. Businessmen are required to anticipate such occurrences and avoid them if they wish to remain in business. This is a valid exercise of business judgment, and it is not the province of the Board or of this court to substitute its judgment for that of management so long as the exercise is reasonable and does not interfere with a protected purpose.

Harrah's, 337 F.2d at 180 (footnote omitted).

I would instead follow the Sixth Circuit's lead in Burger King and hold that an employer can demonstrate special circumstances as a matter of law if the employer reasonably believes that a dress code will enhance its public image and the employer shows that it has maintained, and neutrally enforced, a clear and consistent dress code policy for public-facing employees who are on duty. See Burger King, 725 F.2d at 1055; see also Harrah's, 337 F.2d at 179. The majority rejects this approach for three reasons, none of which are persuasive.

First, the majority notes that Burger King has been "called into doubt by the very circuit that promulgated that

decision."  Ante, at 32-33 n.12 (citing Meijer, Inc. v. NLRB ("Meijer"), 130 F.3d 1209, 1215 (6th Cir. 1997)).  In Meijer, the Sixth Circuit stepped away from the Burger King rule, arguing that the Burger King opinion "did not address, much less explain, how its holding can be reconciled with the Supreme Court's dictate in Republic Aviation that employees have a presumptive right to wear union insignia, and that employers bear the affirmative burden of demonstrating special circumstances."  130 F.3d at 1215.

Yet, the Burger King rule is easily reconcilable with Republic Aviation.  Republic Aviation did not deal with public-facing employees.  As such, the Burger King rule, which only applies where "employees have contact with the public," 725 F.2d at 1055, would not apply to the facts of Republic Aviation on its own terms.  An employer could not, for example, overcome the burden of proving "special circumstances" if its prohibition extended to nonworking times or non-public places.  See Starwood, 348 NLRB at 374.

Similarly, the employer would still shoulder the burden of showing that it did not apply its policy in a discriminatory or lackadaisical fashion.  These are all prerequisites to the application of the Burger King rule.  See Burger King, 725 F.2d at 1055 (noting that the challenged policy must be enforced in a "consistent and nondiscriminatory fashion").  In fact, the Meijer court could have applied Burger King to the facts of its own case

and achieved the same result.  The employer in Meijer only loosely enforced its policy until the union began organizing.  130 F.3d at 1211.  Only then did the employer issue a "reminder" memorandum to employees and begin strictly enforcing its policy.  Id.

Second, the majority notes that Burger King, like Harrah's, dealt with "employees who were subject to a strict uniform policy as opposed to . . . employees who were subject only to a basic dress code."  Ante, at 32 n.12.  As discussed above, however, the uniqueness or uniformity of the image that a company chooses to project to the public turns on "a valid exercise of business judgment, and it is not the province of the Board or of this court to substitute its judgment for that of management so long as the exercise is reasonable and does not interfere with a protected purpose."  Harrah's, 337 F.2d at 180.  Thus, to the extent the holdings in Burger King and Harrah's only applied to "authorized uniforms," I would extend the rule to encompass other clearly articulated dress code expectations such as those found in this case.  See ante, at 63 n.11.

Finally, the majority postulates that this approach "give[s] no weight to the competing concern that . . . bans on protected activity that do not actually serve an employer's claimed legitimate business interests would be imposed."  Ante, at 33 n.13.  Once one respects the boundary between the Board's and the business's respective realms of expertise, however, this concern

recedes. An employer's reasonable belief that its image will benefit from a dress code is sufficient to show that a legitimate business interest exists.

This ensures that the Board's presumption does not invade the proper province of an employer's business judgment. Indeed, the problem with the Board's approach is made quite plain by the record before us. For instance: What else, exactly, did Boch need to show in order to prove that its customers preferred a "professional environment" or that the dress code it adopted would further that image? Did Boch need to conduct focus group testing, run customer surveys, or retain a stylist to "prove up" its judgment that its employees will look more professional if they aren't festooned in a smattering of random paraphernalia? I would hope not. S. New England Tel. Co. v. NLRB, 793 F.3d 93, 94 (D.C. Cir. 2015) ("Common sense sometimes matters in resolving legal disputes.").

Applying a standard akin to that found in Burger King and Harrah's, I think there is little question that Boch has demonstrated an interest in its public image sufficient to satisfy the special-circumstances exception. As in Harrah's, the Board here attacked a "prohibition against all special adornments" that "only applied to employees coming in contact with the public" and "did not purport to prevent the wearing of buttons in nonworking time or in places not open to the public." Harrah's, 337 F.2d at

- 69 -

180.  And there, as here, there was no evidence of unlawful purpose or discriminatory enforcement.  Id.  Because Boch reasonably believed that its public image would benefit from this dress code, I would hold that Boch has satisfied the special-circumstances exception.[27]

In my view, the Board's decision reflects a cavalier disregard for the legitimate prerogatives of those in the private sector and put an unreasonable evidentiary burden upon employers who decide that a professional-looking workforce will be good for business.  Because the majority's decision only compounds the Board's arbitrary reasoning and erroneous interpretations of law, I respectfully dissent.[28]

---

[27]  The majority claims that Boch "simply asserts, in conclusory fashion, that it is just like the employer in Starwood," and so it cannot be saved by "newly presented arguments about how to make . . . tradeoffs" in "workplace matters."  See ante, at 33, 33 n.13.  This is a misreading of Boch's petition, which clearly argues that the business is the proper arbiter of its own public image (by citing Medco and Harrah's) and that Boch has established "special circumstances" (by invoking the Burger King rule).

[28] Given my view that Boch's "public image" interest justifies its dress code, I do not believe that Boch's separate "safety and damage prevention" justification is required.  Nonetheless, I believe that the Board unduly trivializes the risk that pins pose to the interiors, exteriors, and engines of the vehicles that are the lifeblood of Boch's business.  Boch's entire business revolves around selling and servicing vehicles, and it is eminently reasonable to employ precautionary measures.  Perhaps, in an ideal world, salespeople and service technicians would remember to don and doff pins in precise correlation with tasks requiring vehicle contact.  See ante, at 36.  And perhaps, in this ideal world, administrative staff who do not "typically" have contact with vehicles would remember to remove their buttons on those occasions

when they do.  <u>See</u> <u>ante</u>, at 36.  In such a world, the scope of Boch's policy would be indefensible.  But we do not live in that world, and so I believe that Boch's policy involves a reasonable preventive judgment.